1818.

Ridgely
vs
Riggs

The same considerations which induced the belief that the court below erred in the *second* bill of exceptions, are equally applicable to the *third.*

The *fourth* bill of exceptions, in which the jury were precluded by the opinion of the court from applying the payments made by *T.* and *A. Contee* to discharge the item in the account of *J.* and *C. Allston,* which was due to *Allstan* and *Brothers,* is not very material to the merits of the cause; for as the plaintiff has a right to recover for that item, it is unimportant how the credits are applied. But this court are of opinion, that as the claim of *Allstan* and *Brothers* composed a part of the claim of *J.* and *C. Allstan,* and was prior to the debt due to *J.* and *C. Allstan,* without any special direction the payments ought to have been applied to that claim, more especially as the fund, from whence the money was received, was forwarded to *Allstan* and *Brothers* before the new partnership commenced, and there is nothing in the account, on which the suit is brought, to preclude such application.

These remarks are equally applicaole to the *fifth* and *sixth* bills of exceptions, except in the last, the defendant's defence, and the opinion of the court, would be sustained if the act of limitations barred the action. But this court are of opinion that the evidence takes the case out of the act of limitations.

This court are of opinion, that the court below were mistaken in the opinions given in all the bills of exceptions.

JUDGMENT REVERSED, AND PROCEDENDO AWARDED.

JUNE.                              RIDGELY vs. RIGGS.

L R and G R entered into the following agreement in February 1814: "L R has agreed to furnish G R with 15,000 dollars amount of *United States* loan, to be furnished out of the first loan at 88 dollars, for 100 dollars in stock." And afterwards in March 1814, the following agreement was entered into and signed by G R, viz. "In complianee with an agreement made between L R and myself, I hereby authorise and empower him to subscribe in my name and for my use, to the loan shortly to be brought forward by the U. S for the present year, to amount of $15,000, which amount he engages and secures to me shall not cost to me any higher rates than the loan of 15 millions was obtained at; and I hereby engage to make all payments on the said stock of $15,000. he also engaging to me that it shall be rated and cost me as did that of the 18 millions loan to the original subscribers. In case any difference of cost of the said $15 000 more or less, than that of the 16 millions loan, such difference of cost shall be paid in money by ths losing party. L R is also authorised to make good his contract with me by the purchase of stock of any of the former government loans, and I contract on my part to make payment for such stock on the same days and proportions of instalments on which the new loan is settled and demanded." Upon the last mentioned agreement L R brought an action of *assumpsit* against G R, averring in his declaration (having sundry counts,) that he, L R, did, in the name of G R, subscribe for 15,000 dollars of the loan of 1814, at 80 dollars for each 100 dollars, being 8 dollars for each 100 dollars less than the loan of 16 millions cost the original subscribers, making a difference of 1364 dollars, for which last sum the action was brought. Under the act of Congress of March 1814, the Secretary of the Treasury in May 1814, offered to borrow 10 millions of dollars, part of the 25 millions authorised to be borrowed by that act. L R subscribed for G R $15,000, at the rate of 88 for 100 and obtained certificates of scrip for 17,045 50, to which was annexed a condition, that if any part of the 25 millions should be borrowed upon terms more favourable to the lenders, the benefit of such terms would be extended to the persons who may then hold the scrip certificates, or certificates of funded stock. G R paid the several instalments on the loan, and L R delivered to G R the certificates of scrip. In August 1814 a further subscription for 6 millions of dollars was proposed by the Secretary of the Treasury, and 3 millions subscribed for at 80 dollars for every 100 dollars. G R, being the holder of the scrip certificates, applied for and obtained certificates of funded stock thereon, for the further sum of 1704 20 dolls. The county court gave judgment that L R was not entitled to recover. On appea, *reversed;* and also held that the declaration *(to which objections were made)* was sufficient.

A speculating contract as to the price of stock is not a wager inconsistent with the policy of the law, and therefore not void under the act of 1813. ch. 84.

APPEAL from *Baltimore* County Court. This was an action of *assumpsit,* on a special agreement, brought on the

30th of September 1814. The declaration contained *four* counts. The *first*, "that whereas on the 10th of March 1814, at *Baltimore*, to wit, at the county aforesaid, a certain discourse was had and moved between the defendant, (now appellee,) and the plaintiff, (the appellant,) on the terms upon which the loan to be brought forward by the *United States* for the said year 1814, would be effected; upon which said discourse then and there, that is to say, on, &c. at, &c. in consideration that the plaintiff, at the special instance and request of the defendant, had then and there undertaken to subscribe in the name and for the use of the defendant, to the aforesaid loan, to the amount of $15,000, and had also then and there undertaken and promised that the said amount of $15,000 should not cost the defendant any higher rates than the *United States* loan of 16 millions was obtained at, he the defendant then and there undertook and faithfully promised the plaintiff, that he the defendant would make all the payments which might be required on the said subscription to the said loan, to the amount of $15,000, at the rate or rates aforesaid, whenever the said payments should respectively become due; and that in case the said $15,000 of the said loan for the said year 1814, should be rated to, and cost him the defendant less than the same sum was rated to and cost the original subscribers to the aforesaid loan of 16 millions, that he the defendant would pay to the plaintiff the difference on the amount of $15,000. And the plaintiff in fact saith, that afterwards, to wit, on, &c. he the plaintiff did subscribe, in the name and for the use of the defendant, to the said loan, for the said year 1814, to the amount of $15,000, upon the following terms; that is to say, at $80 for each $100 of stock subscribed for, which was $80 per share of stock less than the terms of subscription to the said loan of 16 millions; by means whereof the defendant became liable to pay to the plaintiff the said difference in the terms on the sum of $15,000, to wit, the sum of $1364 current money, of all which premises the defendant on, &c. at, &c. had notice, and the plaintiff then and there requested the defendant to pay him the said sum of $1364 current money, according to the said promise and undertaking of him the defendant." The *second count*: "And whereas also, to wit, on, &c. at, &c. in consideration that the plaintiff at the like special instance and request of the defendant, had then and there undertaken to subscribe in the name, and for the use of the defendant, to the aforesaid loan for the year 1814, to the amount of other $15,000, and had also then and there undertaken and promised, that the said amount of $15,000 should not cost the defendant any higher rates than the loan of 16 millions was obtained at, he the defendant then and there undertook, and faithfully promised the plaintiff, that he the defendant would make all the payments on the said stock of $15,000; and that in case there should be any difference of cost of the said $15,000, more or less than that of the 16 millions loan,

1818.

Ridgely
vs
Riggs.

that such difference of cost should be paid in money by the losing party. And the plaintiff in fact saith, that afterwards, on, &c. at, &c. he the plaintiff did subscribe in the name and for the use of the defendant, to the said loan for the year 1814, to the amount of $15,000, which said amount of $15.000 did not cost him the defendant any higher rates than the loan of 16 millions was obtained at. And that there was a difference of cost of the said $15,000, to wit, the sum of $1364 less than the price of the same sum of the said 16 millions loan to the original subscribers, in consequence whereof the defendant was the losing party; by means whereof the defendant became liable to pay to the plaintiff the said difference of cost of the said $15,000, to wit, the sum of $1364 current money—of all which premises the defendant on, &c. at, &c. had notice, and the plaintiff then and there requested the defendant to pay him the said sum of $1364, current money, according to the said promise and undertaking of him the defendant." The *third count:* "And whereas also heretofore, to wit, on, &c. at, &c. in consideration that the plaintiff, at the like special instance and request of the defendant had then and there undertaken to subscribe in the name and for the use of the defendant to the aforesaid loan for the year 1814, to the amount of other $15,000, and had also then and there undertaken and promised that the said amount of $15,000 should not cost the defendant any higher rates than the aforesaid loan of 16 millions was obtained at, he the defendant then and there undertook and faithfully promised the plaintiff, that he the defendant would make all the payments which might be required on the said subscription to the said loan, to the amount of 15,000 dollars, whenever the said payments should respectively become due; and that in case the said 15,000 dollars of the said loan for the year 1814 should be rated to and cost him the defendant less than the same sum was rated to and cost the original subscribers to the aforesaid loan of 16 millions, that he the defendant would pay to the plaintiff the difference on the amount of 15,000 dollars. And the plaintiff in fact saith, that afterwards, to wit, on, &c. he the plaintiff did subscribe in the name and for the use of the defendant, to the said loan for the year 1814, to the amount of 15,000 dollars, upon the following terms; that is to say, at 88 dollars for each 100 dollars of stock, with this proviso, that in case any of the said loan for the year 1814 should be sold by the government at any terms lower than 88 dollars for each 100 dollars of the loan, that then and in such case the government should return to the defendant the said difference. And the plaintiff further saith, that the government did sell part of the said loan for the year 1814, at 80 dollars for each 100 dollars of the said loan subscribed for, and in conformity with the proviso of the plaintiff, did return to the defendant the difference of eight dollars for each 100 dollars of the loan subscribed for, in consequence whereof the said 15,000 dollars was rated to and cost the

defendant less than the same sum was rated to and cost the original subscribers to the said sixteen millions loan; by means whereof the defendant became liable to pay to the plaintiff the said difference in price, to wit, the sum of $1364 current money. Of all which premises the defendant on, &c at, &c. had notice. And the plaintiff then and there requested the defendant to pay him the said sum of $1364 current money, according to the said promise and undertaking of him the defendant." The *fourth count:* "And whereas also heretofore, to wit, on, &c. at, &c. a certain discourse was had and moved between the defendant and the plaintiff, on the terms upon which the loan then about to be brought forward by the *United States* for the year 1814, would be effected; upon which said discourse the plaintiff then and there affirmed, that if the defendant would authorise and empower him the plaintiff, in writing, to subscribe in the name and for the use of the defendant, to the said loan for the year 1814, to the amount of $15,000, and would engage in writing to make all the payments on the said amount of $15,000, whenever they should respectively become due, that he the plaintiff could procure for the defendant $15,000 of the said loan for the year 1814, at such rates and upon such terms as that the said amount of $15.000 of the said loan for the year 1814, should cost the defendant less than the same amount of $15,000 of the loan of sixteen millions cost the original subscribers, which the defendant did deny, and did promise the plaintiff, that in case he the plaintiff would promise to procure for the defendant $15,000 of the said loan for the year 1814, at the rates and terms aforesaid, and would promise to pay the difference in case the said $15,000 of the said loan should cost more than he the defendant would authorise and empower him the plaintiff, in writing, to subscribe in the name and for the use of the defendant to the said loan for the year 1814, to the amount of $15,000, and would engage in writing to make all the payments on the said amount of $15,000 whenever they should respectively become due, and that in case he the plaintiff should procure the said amount of $15,000 at such rates, and upon such terms as that the said amount of $15,000 should cost the defendant less than the same amount of the said loan of sixteen millions cost the original subscribers, that he the defendant would pay to the plaintiff the difference. And the plaintiff in fact saith, that he did promise the defendant as aforesaid, and that in compliance with his promise, he the plaintiff did procure for the defendant $15,000 of the said loan for the year 1814, upon the following terms; that is to say, at $80 for each $100 of the said loan subscribed for, which was eight dollars for each $100, less than the loan of sixteen millions cost the original subscribers, making a difference of $1364; by means whereof the defendant became liable to pay to the plaintiff the said difference, to wit, the sum of $1364 *current money.* Of all which premises the defendant on, &c. at, &c. had notice; and the plaintiff then

and there requested the defendant to pay him the said sum of $1364 current money according to the said promise and undertaking of him the defendant. Nevertheless," &c. The general issue was pleaded. And at the trial the plaintiff gave in evidence the following memorandum, in writing, made by *William Norris*, by the direction of the plaintiff and defendant, and which was signed by said *Norris* by the direction of both plaintiff and defendant, as their agent: "*Balto*. 1th Feby. 1814. Mr. *Lott Ridgely* has agreed to furnish Mr. *George Washington Riggs* with $15,000 amt. of *United States* loan, to be furnished out of the first loan at $88 for 100 in stock.

*William Norris.*"

The plaintiff further gave in evidence the following written agreement, and which it was admitted was signed by the defendant: "*Baltimore*, March 10th, 1814. In compliance with an agreement made between *Lott Ridgely* and myself, I hereby authorise and empower him to subscribe in my name, and for my use, to the loan shortly to be brought forward by the *United States* for the present year, to amount of fifteen thousand dollars, which amount he engages and secures to me shall not cost to me any higher rates than the loan of sixteen millions was obtained at, and I hereby engage to make all payments on the said stock of $15,000, he also engaging to me that it shall be rated and cost me as did that of the sixteen millions loan to the original subscribers. In case any difference of cost of the said $15,000 more or less than that of the sixteen millions loan, such difference of cost shall be paid in money, by *the losing party*. Mr. *Ridgely* is also authorised to make good his contract with me by the purchase of stock of any of the former government loans, and I contract on my part to make payment for such stock on the same days and proportions of instalments on which the new loan is settled and demanded.

*Geo. W. Riggs.*"

It was admitted by the defendant, that in pursuance of the act of congress of the 24th March 1814, the secretary of the treasury of the *United States* offered to borrow ten millions of dollars, part of the twenty-five millions authorised to be borrowed by said act of congress, and appointed the second day of May in the same year, at the *Mechanics Bank* of *Baltimore*, to receive subscriptions for the said loan; and that the plaintiff did, on the said 2d of May, subscribe for and on behalf of the defendant, $15,000 to the said loan, at the rate of $88 for every $100 of stock created therefor by the *United States*; that is, for the said $15,000 so subscribed, he obtained certificates of scrip to the amount of $17,045 50; to which said certificates the following condition was annexed, to wit: "And if any part of the sum of 25 millions of dollars, authorised to be borrowed by the act aforesaid, shall be borrowed upon terms more favourable to the lenders, the benefit of the same terms will be extended to the person

or persons who may then hold this scrip certificate, or certificate of funded stock which may be issued in lieu of it, after the payments upon it are completed." It was also admitted, that the defendant paid the several instalments, as they became due, according to the terms of said subscription; and that the plaintiff did, in pursuance of the agreement and authority herein before set forth from the defendant, deliver to the defendant the said certificates of scrip for said subscription, with the condition aforesaid annexed to each of them. It was also admitted by the defendant, that the secretary of the treasury, in pursuance of the said act of congress, proposed to receive further subscriptions for six millions of dollars, a further part of the said loan of twenty-five millions of dollars, authorised by the act of congress aforesaid, and appointed the 22d day of August 1814, at the *Mechanics Bank of Baltimore*, and authorised *Dennis A. Smith* to receive said subscriptions; and then and there a large amount, to wit, about three millions of said loan, was subscribed for by divers persons at the rate of $80 for every $100 worth of stock to be created therefor by the *United States*. And the defendant, being the holder of the said certificates of scrip delivered to him by the plaintiff, applied to the proper officer of the government of the *United States* for that purpose, and received, in pursuance of the condition aforesaid annexed to said certificates of scrip, on the 2d of December 1814, certificates of stock thereon for the further sum of $1.704 50, being the amount of the difference between $88 the price of subscription for every $100 of the loan of sixteen millions referred to in said agreement and authority signed by defendant, as herein before set forth, and $80 for every $100 of stock, the price of the subscription made as aforesaid on the 2d of May aforesaid, as regulated and fixed by the rate of subscription aforesaid on the 22d of August 1814. It was further admitted, that the whole of said loan of twenty-five millions of dollars, authorised by the said act of congress aforesaid, has never been filled up. The defendant then moved the court to direct the jury, that if they believed these facts so given in evidence and admitted, the plaintiff was not entitled to recover. Which opinion and direction the Court, [*Bland* and *Hanson*, A. J.] accordingly gave. The plaintiff excepted; and the verdict and judgment being against him, he appealed to this court.

The cause was argued before BUCHANAN, EARLE, JOHNSON and MARTIN, J.

*Winder*, for the Appellant. The only question in the cause is, whether the proof supports the case as set forth in the declaration? The plaintiff was only bound to state the legal effect of his contract, and this legal effect is sustained by the proof. He performed the services, and comes within the defendant's promise.

**1818.**

**Ridgely**
**vs**
**Riggs**

Another question may probably be raised—Whether it is not an illegal wager upon which the party cannot recover? It was a sort of insurance, and is not a wager in a legal or vulgar acceptation of the term.   What might be illegal in *England,* as in *Atherfold vs. Beard,* 2 *T. R.* 610, as to a speculation in the public funds, would not be so here. The essence of our government is that the public revenue should be discussed. Stockjobbing was universally permitted in *England,* until prohibited by act of parliament in particular cases; but there is no prohibition in this country.

*Pinkney,* for the Appellee. 1. The two agreements offered in evidence are to be taken together.   The declaration and the agreement are at variance, and the court below were right in saying the plaintiff was not entitled to recover. None of the counts in the declaration are suited to the plaintiff's case.   The *first* count is objected to on two grounds—1st. It mistakes the terms upon which the loan was negotiated.   It does not contain the precise terms of the contract; but states the terms of the loan peremptory at 88, with a condition depending upon an event which might or might not happen.   2d. The consideration of the promise is mistated, or rather it is inconsistent with the agreement.   If it is a mistatement, it is fatal.   It is a mistatement essential and at variance with the contract.   The engagement of the 8th of February 1814, is to furnish 15,000 dollars out of the first loan at 88 for 100.   This was afterwards modified on the 10th of March, and the effect of the two engagements gave him an alternative.   He might forbear to execute the promise in the engagement of the 10th of March.   What is represented as the promise was not the inducement.   He might furnish other stock, and this is not set out in the count, and is therefore at variance with the agreement.   If it is necessary to set out the consideration, so must also the promise be set out.   The consideration is an essential part of the contract.   It is the foundation upon which the promise stands, and it is as necessary to be set out as the promise; and a mistatement of the one is as fatal as the other. *Penny vs. Porter,* 2 *East,* 2, turned upon the mistatement of the *promise,* and is similar to a mistatement of the *consideration.*   Here the plaintiff has averred a promise, without stating the alternative—it is therefore not the same promise that was entered into.   He was bound to set out his own obligations.   The whole consideration of the promise must be stated, otherwise the contract is mistated, and is a fatal variance. *Miles vs. Sheward,* 8 *East,* 9.   This was a connected transaction, and the whole should be stated.   The contract on the part of the plaintiff was a condition precedent, and forms the substratum upon which the whole was founded.   The plaintiff did subscribe for the stock, and put an end to the alternative.   It was not necessary to meddle with the matter of fact.   He was bound to set out his contract with reference to the defendant.   Subsequent events having rendered it

unnecessary has nothing to do with it. He must set out what the promise was, and that he had elected one of the two alternatives, and then the evidence would be applicable to the subsequent events. He cannot count solely on the legal effect, as brought about by subsequent matters. Every plaintiff is bound to mount up to the commencement of the contract, and should set the whole out. The same objections equally apply to the *second* count. The *third* count has two essential defects. It substitutes what is not in the contract—"then and in such case the government should return to the defendant the said difference." There is no such provision in the agreement. The government made no such pledge. The difference was to be made up by stock to the holder of the certificate at the epoch of completing the loan. This is not only an inartificial statement, but is an inadequate one. It might never be a matter of fact that a loan would be negotiated, or that any part of it would be negotiated on different terms. It depended upon a variety of circumstances—Whether the government would want more money—Whether lenders could be procured and the terms, &c. It was a mere possibility whether the person who obtained the certificate should be the holder at the time when the contingency might happen. It might be the defendant, or his executors or assignees. If it was incumbent on the plaintiff to state the proviso, it was incumbent on him to do it correctly. The *fourth* count states a conversation and assumption, that the plaintiff took upon himself and promised the defendant, that he would procure the loan for less, &c. Here is a wager; it is a bet that he would get it for less, but no promise that he would procure it for less than 88 for 100. This difference constitutes the wager. One party does not wish the other to perform, but wishes him to fail to perform. The plaintiff did not promise to deliver the stock for less than 88 for 100. The whole declaration is manifestly defective; and if this was an action entitled to the peculiar favour of the court, still the consideration and promise must be correctly stated in the declaration.

2. This action was brought on the 30th of September 1814, and the second certificate for the stock was received by the defendant in December 1814, after the action was brought. The plaintiff can only recover upon the right as it existed at the time the suit was brought. If the subsequent receipt of the second certificate, produced in evidence, has any thing to do in the cause, then the suit was brought too soon. The plaintiff having sued before his right of action was perfected, he must fail.

3. But this was a mere wager, inconsistent with the policy of the law, and is therefore void, under the act of December 1813, *ch.* 84. It is manifestly a wager, and cannot be considered in any other light. Here the defendant was to pay—the plaintiff to pay nothing. The wager then commences—that the stock will cost more or less—the difference to be paid by the losing party. What is a

wager, if this is not? The plaintiff was to pay nothing, but was only to act ministerially in subscribing to the loan. He contracted no liability by subscribing; for so soon as he does subscribe, the defendant pays. Then comes the wager—if the stock loaned is higher or lower, then to pay or not. This was a contingency; and if so, then the bet was void at law. If considered as a *wager*, the act of 1813 puts it out of the question, and the plaintiff cannot recover.

4. What is the import of the contract compared with the subsequent events? Putting the technical objections to the declaration out of the way, has the plaintiff made out his case? He must show, without any ambiguity, that he has a right to recover. There is nothing in the peculiar merits of the case to induce the court to stretch the law so as to show the plaintiff has a right to recover. What part of the contract is it which induces a supposition that he has a right to recover? It is not the first engagement, because if the stock was procured under that engagement, the plaintiff would be satisfied. But it is not upon that engagement, it is upon the subsequent one that he relies. That engagement refers to the loan of 16 millions. Does it look to the event or end of that loan? How long were the parties to wait until the contract was completed? Here was a proviso, and the subsequent part of the loan might never be negotiated. Was the contract to continue open waiting for an uncertain event which might never happen—a bare possibility to be realized at a distant period. The natural epoch to which they are disposed to look, is on the completion of that particular subscription—not to the subsequent loan. The stock might or might not be loaned on different contingencies, there being no positive provisions. It was a floating contract, and the possessor of the stock could not tell upon what terms he held it. Suppose the defendant had sold the stock before the loan was fully made, he would fail to receive the benefit which was given by the secretary of the treasury on the subsequent loan. The defendant had every thing to lose, and nothing to gain. His hands were tied up, and the plaintiff left to gain every thing, and to lose nothing. The epoch of the completion of the contract was to be the time of the negotiating of the loan, and it had nothing to do with waiting for what might happen on a further or second negotiating the loan; otherwise it would be to say that the defendant held the stock upon an uncertain tenor. He could not sell, for fear he might get less, and be liable to pay the plaintiff for the deficiency. It would be locking up the stock, and keeping it out of market. If these are not matters of fact, they are what might have been facts. The parties risked on the original terms of the loan, and they looked to no other period. They could not suppose, at the time of the contract, that the whole loan would not have been taken at the first opening the subscription. The benefit given in the provi

so was to whosoever should be the holder of the stock, and if the defendant had sold, he could not be benefited by the terms of the subsequent loan. How can this court, which seeks for certainty, say this is a case in which there is no uncertainty? Can this court believe it is clear that the parties looked to every possible event which might happen relative to the stock? Whatever construction the court may put upon the contract, they cannot say it is clear, and if there is doubt, the plaintiff must fail.

*Winder*, in reply. The plaintiff is not bound to state in his declaration the successive stages in the progress of a contract. It is only necessary to bring the particular fact before court. To show the legal effect of the contract, he might state, and properly too, that he subscribed at 80 for 100. If the legal effect of subscribing at 88 for 100 is a subscription at 80 for 100, then the plaintiff's stating it to be at 80 is correct, and he need not state all the antecedent several stages which brought about the legal effect which is set out. It was a conditional act to be affected by a subsequent event, and if that event is stated, that is enough. In *Penny vs. Porter*, the *party sued* agreed to do one of two things. He was charged, and it should therefore be stated how he was charged, because he might prove that he had elected differently than that stated. But here the plaintiff, by stating in his declaration, shows his election, which he had performed. In the case cited, the defendant had an alternative, here the alternative was with the plaintiff. But this is not an alternative engagement. It is to furnish so much stock in the approaching loan. The plaintiff might accept one act in lieu of another; and it was only necessary for him to set out that which he had performed. Suppose a man engages to build a house by a particular day, and he so declares, but it turns out in evidence that he did not perform by the day; yet if he proves he was excused by the defendant, still he may declare upon the original contract. The subsequent writing of March 1814, goes into a detail of the first engagement, and is nothing more than a mere permission given to the plaintiff what stock he might furnish, which he does not bind himself to do, and is not therefore an alternative engagement. The case of *Miles vs. Sheward*, does not bear more upon the case before the court than does *Penny vs. Porter*. If the two first counts are good, then it is immaterial what may be the character of the others, because this court may apply the verdict to any good count. The *third* count does, it is admitted, seem to be defective, and the objections to it to be valid.

But it is objected that the suit is prematurely brought, because the second certificate of stock was not received until after the suit was instituted. The moment it was ascertained that the subsequent stock, subscribed for in August, was obtained at 80 for 100, the plaintiff's cause of action accrued. He was then to consider his subscription

1818.

Pumphrey
vs
Ashpaw

in May, as a subscription in August. The objection there-fore is wholly unfounded.

It is said again, this is a wager. If it is, every contin-gent contract is a wager. Almost every contract depends upon a contingency; and if this is considered a wager, it will put an end to all contracts. Suppose A agrees to give B $3 per bushel for his wheat; but if the price in three months should be more or less, then A agrees to give that price. This is a wager about the price of wheat; but will it be said to come within the act of 1813. The words of that act embraces every insurance; but can it be supposed that the legislature intended to take in cases of insurance. The act is only intended to strike at *gambling*, and does not extend to contracts. There is nothing to constitute this contract a wager, unless it be because it depends upon a contingency. But it is said that the contract is ambigu-ous, and wholly uncertain, and, therefore, cannot be en-forced; and it is contended to be uncertain, because it de-pends upon a contingency which possibly might not hap-pen. Congress, however, supposed the contingency would happen. The parties did not create the contingency, it was the government who did it. If this was a subject which might be attached, then it entered into the contract of the parties. The government might borrow money, and fix the terms at a future period. There can be no doubt or difficulty as to the contract. If the event had never happened, then the plaintiff would never have come into this court to enforce his contract. The parties chose to make the contract, and if it bears hard on the defendant, it was one of his own seeking. He made it with his eyes open. If there was any clog to the free circulation of the stock, who made it? not the plaintiff—It was the act of the government. The defendant was not bound to keep the stock, he might have parted with it if he had seen fit.

EARLE, J. delivered the opinion of the court, reversing the judgment of the County Court.

BUCHANAN, J. dissented, on the ground that the decla-ration was bad.

JUDGMENT REVERSED, AND PROCEDENDO AWARDED.

---

JUNE.

PUMPHREY's Lessee vs. ASHPAW.

A tract of land called *S F*, was surveyed in 1694 and patented in 1695. Another call-ed *G C*, was sur-veyed in 1796, and patented in 1798.

ERROR to *Anne-Arundel* County Court. This was an ac-tion of ejectment, to recover a tract of land called *The Addition to Goznell's Chance.* Defence was taken on war-rant, and plots were returned.

This last tract is described in the certificate and grant as beginning at a stone heretofore planted in the place or spot where formerly stood a bounded red oak, the last bounded tree of a tract of land called *S F*, and running from thence reverse of the third line of *S F* and bounding thereon, *as now laid down with an allowance of forty-five minutes, for variation* &c.—Held, that the first line of the tract of land called *G C*, must be run from the stone described as the place of beginning, according to the survey made of *S F* in 1796 (the time when *G C* was taken up,) with an allowance of forty-five minutes for variation, as expressed in the certificate and grant, and not according to the true loca-tion of *S F*, as *S F* was originally surveyed in 1694.