## NATHANIEL G. TAYLOR *vs.* WILLIAM H. TURLEY.

*Validity of a Contract between parties residing in Tennessee, during the ascendancy of the Confederate Government.*

A note given in the State of Tennessee, during the ascendancy of the Confederate Government, for a loan in Confederate money, payable two years after date, with interest from date, *in current bankable funds,* is valid, and the payee, in an action instituted after the overthrow of the Confederacy, is entitled to recover the face value of the note, with interest, in United States currency.

APPEAL from the Circuit Court for Howard County.

This was an action brought by the appellee against the appellant, upon a promissory note executed in Carter county, Tennessee, during the ascendancy of the Confederate Government; the consideration was a loan of Confederate money. The case was tried before the Court by consent, and judgment was rendered for the plaintiff for the full amount of the face of the note, with interest.

The defendant appealed.

The cause was argued before BARTOL, C. J., STEWART, MAULSBY and ROBINSON, J., and re-argued before BARTOL, C. J., STEWART, BRENT, MAULSBY, GRASON, ALVEY and ROBINSON, J.

*Wm. Reynolds, Jr.,* and *Thomas Donaldson,* for the appellant.

*Fielder C. Slingluff* and *James Mackubin,* for the appellee.

STEWART, J., delivered the opinion of the Court.

Suit was instituted in the Court below, by the payee against the maker, to recover upon the promissory note of the following tenor:

Taylor *vs.* Turley.

" $9,000.   Two years after date, with interest from date, I promise to pay to Wm. H. Turley, nine thousand dollars, in current bankable funds, and I am to have the privilege, at any time, of paying after six months from this date.

" February 7th, 1863.                    N. G. TAYLOR."

The signature of the defendant to the note was admitted. The plaintiff maintained that he is entitled to recover the nine thousand dollars, with interest, in the currency of the United States.   The defendant on the contrary, insists—1st. That the contract was void, because made upon a loan of *Confederate* money; 2d. That it was a *wagering* contract, and, therefore, not enforcible; 3d. That the holder of the note, in any event, is only entitled to be paid according to the value of *Confederate* money, at the time and place where the note was given, compared with United States legal tender currency.

The case was tried before the Court below, without the intervention of a jury, by consent of the parties.   The Court, after finding the facts, was of the opinion that the plaintiff was entitled to recover the debt in the currency of the United States, and on the 1st of November, 1869, ordered judgment to be entered for the plaintiff.   To this the defendant has excepted.

Where the suit is referred to the determination of the Court below, without the aid of a jury, our review is confined to the decision of the law upon the facts agreed to, or found by the Court, it is not our province to determine whether the Court below has correctly found the facts, but whether the law has been applied to the facts.   When the case is thus determined below and brought here, the facts should be distinctly found and stated, in order that the questions of law arising thereon may be disposed of by this Court.   See *Tinges vs. Moale,* 25 *Md.,* 484.

The right of the plaintiff to recover, and to what extent, depends upon the legal sufficiency of the facts found to con-

stitute a contract obligatory upon the parties, and the character of the contract.

The well settled principles governing contracts and their construction, will enable us to dispose of this case. We will first consider the defendant's objection, that the note was a nullity, because the consideration was a loan of *Confederate* notes.

The *Confederate* Government, consisting of the eleven States, under whose direction and authority civil war was carried on for upwards of four years, was recognized as supreme in most of the territory embraced within their limits. It was the government *de facto*, during the time, within its military lines. The rights and obligations of a belligerent, in its military character, were recognized by the United States.

In all matters of government therein, its power could not be questioned. Civil obedience to its authority was not only a necessity, but the duty of the inhabitants, without which civil order was impossible. This was the government that issued the *Confederate* notes, which were not made a legal tender, and were only payable "after the ratification of a treaty of peace between the *Confederate* States and the United States of America." These notes were used as money, in the transactions of the people, within the military limits of these States.

From its actual supremacy within the territory where this currency circulated, and the necessity of civil obedience of all who remained in it, it must be regarded by the Courts of Law as if it had been issued by a foreign government temporarily occupying a part of the United States.

From these considerations, it results that contracts, stipulating for payment in that currency, are binding and operative to the extent of their just obligation.

These plain principles of public law in relation to the legality of contracts under such circumstances, are unquestionable. So far from the state of war existing at the time,

rendering contracts, made during its pendency, nullities, it is the duty of the Courts, in expounding them, strictly to maintain their validity. In aid of the preservation of social order and civil government, and the maintenance of individual obligation and good faith, they must regard the governing power prevailing at the time, as having authority sufficient for this purpose.

It would, without reason, add to the calamities of war, if the mere fact of its pendency annihilated the contracts of parties made under the same governing authority. Such is not the rule in regard to the contracts of individuals disconnected from the belligerent operations.

No civilized Court of justice has ever sanctioned such a doctrine. On the contrary, the *bona fide* and legitimate contracts made under governments of every description, in war as well as peace, are enforcible in our Courts, unless *contra bonos mores*—against public policy or some positive law.

The *Confederate* States having held the occupancy and actual supremacy, at the time the note in question was given, of that part of Tennessee where the parties contracted, the currency allowed by that authority could constitute a sufficient consideration to support the contract between these parties.

These principles of public law were fully discussed and clearly announced by the Supreme Court of the United States, in the recent case of *Thorrington vs. Smith*, 8 *Wallace,* 1, which was a bill in equity to enforce the vendor's lien, for the balance of the purchase money for the sale of lands in the State of Alabama, for $45,000, proved to have been worth, in gold, but $3,000, upon which $35,000 had been paid in *Confederate* money, and a note for the remaining $10,000 given, to be paid *one day after date,* which the Supreme Court, under the circumstances of that case, where there was no specific description of the currency in which the note was to be paid, said, must be understood and construed as intending *Confederate* notes. The Court below had dis-

affirmed the legality of the contract and dismissed the bill, but the Supreme Court reversed this ruling, and recognized the contract—thus deciding the very question involved here. There is no difference between that case and this, as to the legality of the contract; both were made within the *Confederate* limits, and in reference to *Confederate* money.

But the defendant also objects that this was a *wagering* contract, because made to depend upon the contingencies of war, and, therefore, void.

A contracting party may oblige himself to pay, in any commodity not prohibited by law, or *contra bonos mores*, however fluctuating its value. Because the value, at the time of payment, may be uncertain, is no reason, *per se*, why the contract should be set aside. If this were so, but few contracts could be sustained, for the great mass of contracts depend upon contingencies.

If parties make contracts upon contingencies equally uncertain to both of them, or with equal means of information, upon what ground can the Courts undertake to set them aside? All articles of trade and merchandise, with the currency itself, are subject to great uncertainty in the values, but where there is no fraud, parties are bound by their contracts in relation thereto.

A *speculating* contract, as to the price of stocks at a future day, is not a *wager*, inconsistent with the policy of the law. *Ridgely vs. Riggs*, 4 *H. & J.*, 358.

If the maker of the note here, contracted in reference to the uncertainty of the currency at the maturity of the note, and promised to pay the debt in whatever might then be "current bankable funds," with his eyes open, and full knowledge of the surrounding circumstances, upon what sound principle, is the contract to be avoided? It was competent for him so to contract, and it is not the duty of the Court to vacate the contract, or to make a different one for the parties.

But it is urged, that however the parties may have made their contract, that there is such inadequacy between the con-

Taylor *vs.* Turley.

sideration and the amount to be paid, occasioned by the subsequent events, that it would be unjust to hold the maker bound. Assuming the contract to be subsisting, is there any force in this objection? It was perfectly competent for the parties to have made the note payable in whatever currency they pleased, not prohibited by law—in gold or in *Confederate* money, or in current bankable funds, and it could make no difference as to the binding character of the contract, whether the maker thereof gave the note for a loan of gold, *Confederate* money, or for the purchase of some article of merchandise. Whether he made a good or bad bargain, or received a full equivalent for what he promised to pay, cannot affect the legal character of his obligation.

Parties contracting, must determine for themselves the value and benefit of the consideration, as of the other constituents of their contract.

It is not the province of the Courts to interfere with the natural right of parties to contract, and to exercise their own will and judgment upon the subject; and they have the power to estimate the value of the consideration and the benefits to be derived from their contracts, where there is no incompetency to contract, no fraud or surprise, and no rule of law is violated. Whilst there must be some consideration, otherwise the contract is *nudum pactum*, it is sufficient if it be slight, or may be valuable to the party promising. Even in equity, where contracts may be re-formed, although a consideration is necessary, when the agreement is not under seal, *inadequacy* of consideration is no ground for impeaching a contract—folly, weakness, or want of judgment, will not necessarily defeat a contract. *Chitty on Cont.*, 30, 31; *Stewart vs. State*, 2 *H. & G.*, 114.

It is certainly not the duty of Courts to shape the contracts of parties, but to enforce such as the parties make. The contract must be construed by the natural and fair import of its terms, without reference to the hardship it may visit on the parties. If persons voluntarily express them-

selves in writing, they are bound by the language employed, interpreted by all the evidence admissible for that purpose. *Brown vs. Waters,* 2 *Md. Ch. Dec.,* 201; *Wagner vs. White,* 4 *H. & J.,* 566; *Barney vs. Smith,* 7 *H. & J.,* 345; *Abbott vs. Gatch,* 13 *Md.,* 314. If any inadequacy of consideration could affect the legal·character of the contract, the objection in this case could have but little force. It appears, from the evidence, that the *Confederate* money received by the defendant was in fact valuable to him, in the payment of his debts, and in the transaction of his ordinary business, but this was not a fact material to the recovery on the note, as the mere inadequacy of the consideration, if such had been the case, untinctured by fraud, was not sufficient to vacate the contract. *Stewart vs. State,* 2 *H. & J.,* 114.

The note not being void, but founded on a legal consideration, what is the interpretation to be given to it? Is the holder only entitled to be paid, according to the value of *Confederate* money, at the time and place where the note was given, compared with gold? This must depend upon the construction to be given to the instrument, as to the meaning of the parties thereto, and this is the material question to be determined in the case.

The fact that the maker of the note received the $9,000, in *Confederate* money, might *per se,* afford a presumption that such sum was to be paid in like money, if not negatived by the express language of the instrument, that it was payable in "current bankable funds." He may have received that sort of money and it was competent for him therefor to oblige himself to pay the same amount in gold, and if such had been the fact, the agreement was valid. It was incumbent upon him to show, that "current bankable funds," meant *Confederate* money, inasmuch as that would have been the result, if the language in the notes had not otherwise provided.

What then did the parties to this note mean? Every person who signs an instrument of writing is considered as

understanding the nature of the obligation into which he enters, and subjects himself to the legal consequences flowing therefrom; that is, the law assumes that the parties comprehend the contract, into which they have entered, and the liability incurred. The fact is not disputed here, that the parties to the note were both competent to contract and possessed equal opportunities of determining as to the force and effect of the surrounding circumstances and the scope of the contract.

In construing the contract, the first object is to ascertain the meaning of the parties, which must be carried into effect, unless against some rule of law. The sense and meaning of the parties is to be collected from the terms of the contract, and their intention at the time of the execution of the contract must govern. *Wood vs. Repold,* 3 *G. & J.,* 125 ; *Benson vs. Boteler,* 2 *Gill,* 74; *Jones vs. Plater,* 2 *Gill,* 125 ; *Gist vs. Drakely,* 2 *Gill,* 330 ; *Harper vs. Hampton,* 1 *H. & J.,* 622 ; *Union Bank vs. Ridgely,* 1 *H. & G.,* 327.

Has it been shown by the evidence that the note was payable in *Confederate* money, and that such was the understanding of the parties when they employed the language "current bankable funds?"

In the case of *Thorrington vs. Smith,* as in this case, the intention of the contracting parties, was the material enquiry to be considered.

The fact that the obligation, in *Thorrington vs. Smith,* was given at Montgomery, Alabama, for the payment of ten thousand dollars, without any specific provision as to the currency in which that sum was to be paid, and the note in this case, in express terms, stipulating for payment "in current bankable funds," make the distinction in the construction of the two instruments, as to the intent of the parties.

In the former case the Supreme Court held that the maker could only be compelled to pay according to the actual value of the *Confederate* currency, measured by the gold standard, because the *Confederate* notes being a prohibited currency

Taylor *vs.* Turley.

when the note was payable, their value at the time of the contract must be the measure of settlement under the circumstances—the *Confederate* currency being the one in the contemplation of both parties to the note.

The same conclusion would follow in this case, if this note had been silent as to the currency in which payable, or had stipulated for its payment in *Confederate* money, such a currency at the time of payment being prohibited. The question is simply one of construction as to what was in fact the meaning of the parties to the contract, and in what currency did they intend the note should be paid at the end of the two years.

The language of the note in question is so explicit in providing for the currency in which the debt was to be paid, and so expressly stipulates that it shall be paid in "current bankable funds," (and the proof is unquestioned that at the maturity of the note the United States currency prevailed,) that it is not easy to conceive how payment in that currency can be avoided.

What evidence has been adduced that the parties at the execution of the note, meant by the terms "bankable funds" *Confederate* money? and what legal effect can be given to the contract, different from its express terms, in the absence of proof as to the meaning of the parties or in conflict with its positive provisions?

The contract having been made at a time and place, when and where the *Confederates* had the supremacy and *Confederate* notes formed the currency, might have been construed as payable in that money, if the maker of the note had promised to pay nine thousand *dollars*, without other description of the money in which it was payable. The word, *dollars*, might have been interpreted to mean *Confederate* money, but the parties were aware that a civil war was raging, that the authority then actually prevailing had been recently inaugurated, and was by no means to be considered permanently secured and established, but on the contrary was contending

for its existence against the opposing force, and its continued and ultimate establishment depended upon the fortunes of war. Considerations as to the uncertainty of the controlling power and the character of the currency, two years in advance, might naturally enter into the calculations of parties contracting to pay debts after such a lapse of time.

Under these circumstances, very different from what might have been the case under an established government, and in a time of peace, the maker of this note, in place of guarding against misconstruction by expressly providing for its payment in *Confederate* money, if such had been the design, or saying nothing about it, or leaving it to legal inference, stipulates for its payment, in unmistakable language, " in current bankable funds," thus warranting the necessary conclusion that owing to the uncertain character of the circulation, depending upon the contingencies of war, the parties intended to provide, by express stipulation, that the note should be paid in whatever might be the prevailing currency. The provision in the note reserving the privilege to the maker to pay it at any time after six months, and not before, is consistently explained upon the hypothesis that after the six months another currency might be introduced. None of the facts indicate an understanding between the parties that the currency specified in the note had reference exclusively to the continuance of *Confederate* money as the only bankable circulation for the next two years. On the contrary they shew that the parties contracted in view of the fluctuating nature of the currency depending upon the fortunes of the war—at one time *Confederate* notes constituting the currency and at another the currency of the United States, as the contending forces alternately obtained the ascendancy.

These changes in the currency, whilst they did not impair the validity of the contract, do not furnish any evidence whatever to overrule the positive stipulations of the note, that the debt was payable in " current bankable funds." On the contrary, confirm the conclusion that the parties contemplated

Taylor *vs.* Turley.

the very possible occurrence of a different currency from the one then existing, and adapted the terms of the note to meet such contingency.

According to the plain canons of interpretation, the note upon its face clearly defining the nature of the contract, and that the debt was to be paid in "current bankable funds," and it being found as a fact that United States currency, was, at the time the note was payable, the only bankable currency, the plaintiff, under the contract, is entitled to recover the debt in the prescribed currency, the defendant having failed to shew that the parties, when they employed the language used in the note, intended thereby to provide for its payment in *Confederate* money. The burden was on the defendant to make this out, and he has not shewn that such was the case.

*Judgment affirmed.*

(Decided 20th January, 1871.)

BARTOL, C. J., and GRASON and ALVEY, J., concurred in the opinion that the judgment ought to be affirmed on the ground that by the construction of the note, the amount secured thereby was payable in current bankable funds at the time and place for the performance of the contract; and because there is nothing disclosed by the extrinsic proof, even if the same could properly be considered for that purpose, which varies the meaning of the contract itself.

BRENT, MAULSBY and ROBINSON, J., dissented; being of opinion that the note, according to its terms, when construed in the light of the facts and circumstances disclosed by the evidence, was payable in Confederate currency, and that the appellee is therefore entitled to recover only an equivalent value in the lawful money of the United States, in accordance with the decision of the Supreme Court in *Thorrington vs. Smith,* 8 *Wallace,* 1