# L. ROY WILSON

*vs.*

# CHARLES EDWARD HILLIARD, Executor, et al.

*Contracts: interpretation; fair import of words used; contracts signed unread; effect of—.*

Contracts are to be interpreted and enforced according to the fair import of their terms, without reference to the hardships that may fall on the parties.                    p. 15

If persons voluntarily express themselves in writing, they are bound by the language they employed.                p. 16

The mere fact that a party did not read the whole of a contract before he affixed his signature thereto can not relieve him from the consequence of his act.                    p. 16

The law presumes the parties to understand the import of their own contracts, and to have entered into them with knowledge of their mutual rights and obligations.        p. 15

*Decided June 27th, 1917.*

Appeal from the Orphans' Court for Washington County.

The facts are stated in the opinion of the Court.

The cause was argued before Boyd, C. J., Briscoe, Thomas, Pattison, Urner, Stockbridge and Constable, JJ.

*Edgar Allan Poe* (with *Bartlett, Poe & Claggett* on the brief), for the appellant.

*Levin Stonebraker* and *J. A. Mason,* for the appellees.

THOMAS, J., delivered the opinion of the Court.

The appellant, on the 13th of February, 1917, filed in the Orphans' Court of Washington County a petition, in which he alleged that he was a grandson and legatee of John L. Nicodemus, deceased; that Charles Edward Hilliard, executor of the deceased, had filed his fourth account, which the Orphans' Court had approved on the 6th of February, 1917, in which the petitioner was charged with the sum of $10,-000.00 "by virtue of" the following paper executed by him:

"I, Roy Wilson, of Baltimore, Md., hereby acknowledge that I have this day received of my grandfather, John L. Nicodemus, the sum of ten thousand dollars, which said sum of $10,000 I hereby promise to pay to him if at any time he should demand payment thereof, and in case no such demand be made by my said grandfather in his lifetime, I consent and agree that the said $10,000 shall be charged against me in the distribution of his estate, and I hereby authorize and direct the person or persons legally authorized to administer the estate of my said grandfather to charge and deduct the said sum from any legacy or distributive share of said estate to which I may in any way be entitled, either as legatee or heir-at-law.

Witness my hand and seal this 6th day of October, 1912.

Test: J. L. Nicodemus.          (Sgd.)

                    L. Roy Wilson.   (Seal)"

The petitioner further alleged:

"That he never received the sum of ten thousand dollars ($10,000.00) mentioned in said paper, but that he did receive from his grandfather at the time of the execution thereof (5) five five per cent. (5%)

O'Gara Coal Company bonds numbered 1797, 1798, 1799, 1800 and 461, and five (5) six per cent. (6%) Mobile Terminal and Railway Company bonds numbered 151, 152, 153, 160 and 161. That at that time the O'Gara Coal Company bonds had a market value somewhere between seventy-nine (79) and eighty-five (85) and Mobile Terminal and Railway Company bonds had a market value somewhere between ninety-six (96) and one hundred (100). At the time of the death of the said John L. Nicodemus both the O'Gara Coal Company and the Mobile Terminal and Railroad Company were in the hands of receivers and the value of the said bonds had, therefore, greatly diminished, the O'Gara Coal Company bonds being worth about twenty-five (25) and the Mobile Terminal and Railway Company about thirty (30). (3) That during the lifetime of his grandfather, he was not at liberty, under the terms of the receipt above set forth, to dispose of said bonds because the said receipt obligated him to return the said bonds to his grandfather if at any time he should demand their return. That by the true construction of said paper, dated October 6th, 1912, signed by your petitioner and delivered to his grandfather at the time of the receipt of the bonds above mentioned, the said John L. Nicodemus only intended to charge your petitioner with the receipt of said bonds and only intended, in case he failed during his lifetime to demand of your petitioner a surrender of said bonds, that the executor of his will should only charge against and deduct from the legacies to your petitioner, under said will, the actual value of the bonds as of the time of the payment of the said legacies."

The petition then prayed that the account be "reopened and restated," and that the petitioner be charged in the new account with the present market value of the bonds.

The petition was answered by the executor and by Edwin M. Connor, one of the grandchildren and legatees of the

deceased, denying the allegations of the third paragraph thereof, and the matter was set down for a hearing by the Orphans' Court.

At the hearing, counsel for the petitioner made the following offers of proof:

"We offer to prove by Mr. Wilson (the petitioner) that in October, 1912, the time these bonds were delivered to him by his grandfather, the O'Gara bonds had a market value of about 70 to 80, and the Mobile bonds a market value from 96 to 100. That at the time of the death of Mr. Nicodemus, the testator, the O'Gara bonds had a market value of about 42 and the Mobile bonds had a possible market value of 70 to 85, although no bonds were actually sold at that time. That the present market value of the O'Gara bonds is between 20 and 30, and the present market value of the Mobile bonds about 35.

"That the receipt that he signed on October 6, 1912, was shown him just shortly before he started for the train; that he didn't read the entire receipt and only read down to the part where * * * he promised to pay to his grandfather if at any time he should demand payment thereof. That the first time that he ever read the receipt in its entirety was when he received a copy of it from the executor, enclosed in a letter from the executor dated May 22, 1916. That until his grandfather's will was read he had no knowledge that any legacy or devise was left to him."

"We offer to prove by Mrs. Nicodemus, widow of the testator, that she was present at the time of signing this receipt. That $10,000 in cash was not given to Roy Wilson at that time, but that there was delivered to him five 5% bonds of the O'Gara Coal Company, Nos. 1797, 1798, 1799, 1800, 461, and five 6% Mobile Terminal & Railway Company bonds Nos. 151, 152, 153, 160 and 161, said bonds being of the par value of $1,000. That a receipt was signed by the petitioner, Roy Wilson, just as he was leaving for the

train on Sunday, the 6th of October, 1912, and was
hurriedly read over by him.

"That subsequent to the delivery to Roy Wilson of
the above mentioned bonds and prior to the death of
John L. Nicodemus, the O'Gara Coal Company went
into the hands of receivers and also the Mobile Ter-
minal & Railway Co. That Roy Wilson shortly after
the O'Gara Coal Co. went into the hands of receivers,
wrote to John L. Nicodemus, asking what he was to
do with the O'Gara Coal Company bonds, and at the
instance of John L. Nicodemus, Mrs. Nicodemus wrote
to Roy Wilson, to wit, on September 24, 1913, 'Send
bonds at once.'"

The Orphans' Court sustained objections to this evidence
and the petitioner excepted to the rulings, and the "peti-
tioner not desiring to offer other testimony," the Orphans'
Court, on the 24th of February, 1917, passed the order from
which this appeal was taken, dismissing the petition and
requiring the petitioner to pay the costs.

The argument of counsel for the appellant in his brief is
devoted to the questions of the admissibility of the evidence
offered by the petitioner and the jurisdiction of the Orphans'
Court to construe the paper executed by him. But even if
the jurisdiction of the Orphans' Court be conceded, and the
evidence offered be treated as admissible and allowed full
effect, it is quite clear that it would not warrant a reversal
of the order dismissing the petition.

Assuming that the petitioner *actually* received five O'Gara
Coal Company bonds and five Mobile Terminal and Rail-
way Company bonds, each of the par value of $1,000.00, in-
stead of $10,000.00, what would be the effect of the paper
or agreement executed by him? If we write into the acknowl-
edgment of having received $10,000.00 the bonds referred
to in the evidence, in the place of the $10,000.00, we would
still have the promise of the petitioner, under seal, in con-
sideration of having received said bonds, to pay to his grand-

father $10,000.00 if at any time he demanded payment of that sum, and, in case no such demand was made, his agreement that $10,000.00 should be charged against him in the distribution of his grandfather's estate. There is no intimation here of any fraud or mistake, and the only question involved is the proper construction of the paper. The petitioner and his grandfather knew what was delivered to and received by the petitioner, and in view of that fact, the only reasonable and possible construction of the paper is that they treated the bonds as equivalent to $10,000.00, and agreed that they should be so regarded. To hold that the promise of the petitioner was to deliver *the bonds* to his grandfather if he demanded them, and that his agreement was that he was only to be charged with the value of the bonds in the distribution of his grandfather's estate, would require us to disregard the terms of the paper, which are too plain to admit of any doubt as to their meaning, and to substitute for the written promise and agreement of the petitioner another and altogether different obligation.

In *Abbott* v. *Gatch,* 13 Md. 314, the Court said: "The law is well settled that contracts are to be interpreted and enforced according to the fair import of their terms, without reference to the hardships that may fall on the parties. *Wagner* v. *White,* 4 H. & J. 566; *Barney* v. *Md. Ins. Co.,* 5 H. & J. 143; *Dorsey* v. *Smith,* 7 H. & J. 345. If persons voluntarily express themselves in writing, they must be bound by the language employed. *McElderry* v. *Shipley,* 2 Md. 25. The law presumes that they understand the import of their own contracts, and to have entered into them with knowledge of their mutual rights and obligations." In *Taylor* v. *Turley,* 33 Md. 500, JUDGE STEWART said: "It is certainly not the duty of courts to shape the contracts of parties, but to enforce such as the parties make. The contract must be construed by the natural and fair import of its terms, without reference to the hardship it may visit on the parties. If persons voluntarily express themselves in writ-

ing, they are bound by the language employed, interpreted by all the evidence admissible for that purpose." And in the case of *Dixon* v. *Clayville,* 44 Md. 573, CHIEF JUDGE BARTOL said: "It has been well observed that 'there is no general rule better settled, or more just in itself, than that parties who enter into contracts and especially contracts in writing, must be governed by them as made, according to their true intent and meaning, and must submit to the legal consequences arising from them.'

"It is a familiar principle that 'the intention of the parties contracting must govern where that can be discovered, unless that is in contravention of some rule of law.' *Chew* v. *Buchanan,* 30 Md. 367.

"This intention must, however, be ascertained from the terms of the contract itself, where this is in writing and free from ambiguity."

The evidence offered to the effect that the petitioner did not read the whole instrument can not aid in the construction of the paper or relieve him from the consequences of having executed it. *McGrath* v. *Peterson,* 127 Md. 412. Nor does the fact that the petitioner, in reply to his letter to John L. Nicodemus, was notified to "send bonds at once," point to the conclusion that the intention of the parties was other than that plainly expressed in the paper. What John L. Nicodemus' purpose was in directing the bonds to be sent to him is not shown, and is not material to the inquiry here, nor does it appear that the O'Gara Coal Company bonds were ever sent to him in compliance with the letter from Mrs. Nicodemus.

It follows from what has been said that the order of the Orphans' Court must be affirmed.

*Order affirmed, with costs.*