## DORSEY *vs.* SMITH.—June, 1826.

A, by will, devised his real estate to his wife S for life, and after her death to his brother C, in fee, charged with the payment of £500 to each of his two sisters, to be paid in one year after C took possession of the estate. After the death of A, his widow S, the tenant for life, married D in 1812. In 1814 D entered into a written contract with C, the remainder-man, by which C agreed to sell him all his interest in the estate for $10,000, payable in three equal annual payments, the first to be paid the 25th December in the same year, and all, except $2,800 bearing interest till paid. D was to give bond, with security, for the payment of the purchase money in manner before mentioned, and on payment thereof, C was to execute a conveyance of the land to D in fee. Endorsed on this contract was this agreement—"It is understood that the legacies, charged by the will of A, to be paid out of his real estate, are not to be satisfied by D, but that the land is to be exonerated by C, from the payment thereof." The first instalment under the contract was paid by D, and bond with security given for the balance. On this bond judgment was rendered at law against D, one of the legacies charged upon the estate being still outstanding, and the other having been purchased by D. A bill was then filed by D, praying an injunction to stay proceedings on the judgment. After the filing of the bill, the outstanding legacy was purchased by C.

*Held*, 1. That the true construction of the agreement endorsed on the contract of purchase between D & C, was that the estate itself was to be freed from all liability to pay the legacies with which it was charged, and not merely that D was to be personally indemnified from their payment; and that though it was an agreement which C might have some difficulty in complying with, it was not an impossible one, and that he was bound to perform it before he could call on D for the whole purchase money.

*Held*, 2. That as the money was to be paid in instalments, and the said agreement was in general terms that the land was to be exonerated from the outstanding legacies, C had, *until the last instalment became due*, to comply with the agreement; and that therefore, upon the instalments, which fell due before that time, D was bound to pay interest, although the legacies were not discharged, having by his contract expressly agreed to pay interest. That D could not have relieved himself from the payment of this interest unless he had actually tendered the amount due.

*Held*, 3. That upon the last instalment interest could not be charged for the whole time, as the legacies were still outstanding, and C refused to exonerate the bond from their payment, supposing that he was not bound to do so, but merely to give D a personal indemnity against them. That it would however be otherwise, and interest might be charged, if D could be considered as having taken possession under his purchase, or to have been in the reception of the rents and profits of the estate sold.

*Held*, 4. That D was to be considered as only the purchaser of a dry remainder, there being a tenant for life in possession.

*Held*, 5. That the wearing out of a life-estate, in a case of this kind, is not, as a general rule, equivalent to the taking of the profits so as to charge

the purchaser of the remainder with interest, unless the purchaser has himself been in default, and the delay in the completion of the contract has been owing to such default.

*Held,* 6. That when C purchased one of the legacies he was entitled to a part of the last instalment, and to interest upon it, from the time of such purchase.

*Held,* 7. When an instrumentary witness resides out of the jurisdiction of the court, so as not to be amenable to its process, or cannot be found after diligent enquiry, the proof of his hand-writing is evidence of every thing on the face of the instrument.

*Held,* 8. That D was not entitled to be credited for the legacy bought in by him, with what he paid for it, but only with its fair value at the date of the purchase; and that that value was to be estimated by analogy to the rule adopted in the court of chancery in this state, for ascertaining a woman's allowance in lieu of dower in land sold under a decree of that court, and not by a reference to *Dr. Halley's* table of observations.

*Held,* 9. That each party, being in some respects in default, was to pay his own costs in the court of chancery.

APPEAL from a decree of the Court of Chancery. The facts of this case are sufficiently stated in the final decree of the chancellor. The bill, which was filed by the appellant, (and *S. Chapman* his surety, who is since dead,) against the appellee, on the 20th of December 1819, prayed an injunction to stay proceedings on judgments at law obtained by the appellee against the appellant, and his surety. The injunction was granted, and on a motion to dissolve it, on the coming in of the answer, the following decretal order was passed at July term, 1820, by

KILTY, Chancellor. The motion to *dissolve the injunction* in this case, was fully argued at the present term, and the proceedings have been considered. The rule recognized in the case of *Colegate vs. Lynch,* 2 *Harr. & Johns.* 34, which was referred to, is considered a proper one, and has been since acted on; but it might be oppressive where the sum was small, and the party to be affected by it not in fault. In this case the credit claimed was $300, but it appears that $257 were credited, leaving only $43 to be further allowed, and it is not stated that *Smith* was called on to correct the mistake. There is, however, no occasion to rely on that rule, it being clear that the answer, and the exhibit referred to, do not constitute such a denial of the equity of the bill, as to entitle the defendant to a dis-

solution of the injunction. The equity of the bill arises on the agreement in writing exhibited, and more particularly on the addition thereto respecting the legacies. The court is not called on at this time to decide finally on the means by which the land is to be exonerated; but as the legacies are not to be satisfied by *C. Dorsey*, it would seem that he ought to be secured from the risk of his being hereafter obliged to satisfy them, even though he might eventually be repaid; and on this question the answer of the defendant, although taken as true in respect to the facts, cannot extend to change the terms of the written agreement, or to establish its legal meaning and construction.

Commissions afterwards issued to take testimony, which was taken, and the cause set down for hearing, and then referred to the auditor to state and audit the accounts. On the coming in of the auditor's report, the following decree was pronounced by

JOHNSON, Chancellor, (March term 1824.) *Henry A. Smith*, by his last will, dated the 17th of July 1802, devised to his wife *Dicandia Smith*, "during her life, all the land whereon I now live, near and adjoining *Benedict Leonard Town*, in *Charles* county." To each of his two sisters he bequeathed £175, and directed that so much of his personal property, as should be necessary, should be sold for the purpose of paying those legacies. To his wife, charged with the legacies, he gave all his personal property. The remainder, after the death of his wife, in the land devised to her for life, he gave to his brother *Charles S. Smith*, the defendant, in fee, charged with the payment of the sum of £500 to each of his two sisters, *Margaret*, and *Mary Wheatley*, to be paid "in one year after my brother enter into the possession of the above land;" that is, in one year after the death of his wife, to whom the life-estate was given. On the death of the testator his widow possessed the property, and in the year 1812 intermarried with *Clement Dorsey*, one of the complainants.

On the 13th of March 1814, *Dorsey* entered into a contract with *Smith* for the purchase of his remainder in the land, inaccurately termed his "reversionary interest." By the agreement in writing signed by the parties, *Smith* "sells, and here-

by agrees to sell unto the said *Clement Dorsey*, and his heirs, all his *reversionary interest*, (being a fee simple in and to that tract or parcel of land devised by a certain *Henry A. Smith*, lately deceased, to his wife *Dicandia Smith*, now *Dorsey*,) to and for the price of ten thousand dollars, payable in three equal annual payments; the first whereof to be paid on the 25th of December in the present year, and all of which money, except the sum of two thousand eight hundred dollars, bearing an interest from the date hereof till paid; and upon payment of which said purchase money, with the interest, the said *Smith* or his heirs, is to execute to said *Dorsey* a deed or release in fee simple; and the said *Dorsey* agrees to pay him the said money, with interest thereon as aforesaid; and further to execute to the said *Smith*, with *Philip Stuart*, or such security as *Smith* shall approve, a bond conditioned for the payment of the money as aforesaid, with interest thereon as aforesaid." On the agreement is the following endorsement signed by *Dorsey* and *Smith:* "It is understood that the legacies charged by the will of *Henry A. Smith* to be paid out of his real estate, are not to be satisfied by *C. Dorsey*, but that the land is to be exonerated by *Charles S. Smith* from the payment thereof." The controversy between the parties principally arises from this endorsement. The first instalment was paid.

On the 23d of March 1815, in pursuance of the stipulation that bond with approved security should be given for the purchase money, *Dorsey*, together with *Samuel Chapman*, the other complainant, executed a bond to *Smith*, conditioned to pay the sum of $6,666⅔ as follows: $3,333⅓, with legal interest on the sum of $4,888 89, from the 25th of December 1814, on or before the 25th of December 1815; and the further sum of $3,333⅓, being the residue thereof, with interest on $2,444 44, from the 25th of December 1815, on or before the 25th of December 1816.

In the very commencement of the dealing between *Dorsey* and *Smith*, the instruments of writing, intended to meet the engagements of the parties, appear so inaccurately or hastily drawn, that there is nothing surprising in finding a difference of opinion as to their true character and effect. In the original agreement, instead of stipulating that all the money, except the

the sum of $2,666⅔, (that being the £1000 legacies charged on the land,) bearing an interest from the date of the agreement, the whole, except the sum of $2,800, is to bear interest—a plain and manifest mistake. And the bond executed by *Dorsey* and *Chapman* varies most materially from the contract, under which the bond was given, with the intention, so far, of executing that contract.

As early as the 14th of April 1815, it appears that a difference of opinion existed as to the true meaning of the original contract, so far as related to the sum of money exempted from interest on account of the legacies; the one, *Smith,* contending that one third of that sum was to be paid as the instalments became due; the other, that no part of that sum was to be paid until the last payment. The subject matter of *this* difference, they referred to the decision of a mutual friend; no opinion, however, appears to have been expressed by him. On the same day the error in the bond having been discovered, by an endorsement thereon signed by *Smith*, he agreed that "the condition of the preceding bond may be defeated by the following payments, to wit: $3,333⅓, with interest thereon from the 13th of March 1814, on or before the 25th of December 1815, and the further sum of $3,333⅓, with interest on $666 ⅔, from the 13th of March 1814, on or before the 25th of December 1816.

In the fall of 1815, when the second payment was becoming due, the bill alleges that *Smith* in a conversation with *Dorsey,* expressed his apprehensions of bank paper, when *Dorsey* asked him if he would take good bonds. This he refused; but subsequently informed *Dorsey* he would take bank notes, which were obtained, and then *Smith* refused to accept them; and *Smith,* on being told by *Dorsey* he could not afford to keep so much money by him, appeared to assent to a proposition made by *Dorsey,* that he must wait until the money was raised from his crops. Other grounds for relief are set forth in the bill, not deemed material to be mentioned. The great obstacle to a settlement by the parties, was the legacies charged on the land; and after various letters passing between the parties, the one insisting that the land must be exonerated from the legacies previous to the payment of the purchase money, the other the reverse, ultimately one of the legacies was purchased by

*Dorsey.* Suits were brought on the bond, judgments in *Charles* county court obtained, which were removed to the court of appeals, and there affirmed at June term 1819.

On the 20th of December 1819, the present bill was filed, and injunctions obtained, which were continued by my predecessor, on the motion to dissolve.

*Smith,* in his answer, denies most of the equitable grounds relied on by the complainants for the interposition of this court, except that he admits two payments, one of $300, and the other of $900, which do not appear to be credited on the judgments; although there is nothing in the cause by which it appears that credit for them was ever refused.

Since the filing of the bill, *Smith* has purchased the other legacy which was charged on the land.

After the argument of the cause an interlocutory decree passed, directing the auditor to state accounts in various ways; and in that decree it was remarked, "as the merits of the cause have been fully argued, there will be no necessity that further time should be spent by an argument on the report; the report is designed to enable this court, as well as the court of appeals, (should the case go before them,) finally to adjudicate on the subject by pronouncing a judgment in favour of the party entitled for the sum which may appear to be justly due. And that the accounts may appear in different forms," it was ordered that an account be stated crediting *Dorsey* with the payments, disregarding his claim for the legacy, and charging him with interest. A second account allowing, in addition to the payments, the sum he gave for the legacy, excluding interest after the payments became due. A third account including interest. A fourth account crediting *Dorsey* with such a sum on account of the legacy, as with the addition of seven years' interest thereon, will amount to $1333⅓, or £500, including interest; and a a fifth account, in conformity with the same rules, excluding interest; and such other account in such other way as shall appear to the auditor equitable and just.

In pursuance of the decree the accounts have been stated—one of them crediting *Dorsey* with the sum the legacy was worth, according to the calculations or table of observations by Dr. *Halley,* which are usually resorted to in order to ascertain

the present value of a legacy made payable after the expiration of a life. The report and accounts having laid the usual time, the cause at this term stands for final decision.

Several points arise in this case—*First.* Ought interest to be charged, and from what time?

*Second.* Is *Dorsey* entitled to a credit on account of the legacy charged on the land; and if so, to what amount; that is, ought he to have credit for the price at which he purchased it, or for its real value at that time? And

*Third.* How should the costs be taxed?

In respect to the *first* point. It appears to me perfectly unimportant to enter into a historical account respecting interest; for although at one time it was not allowed, yet that period has long since, in *Great Britain*, and this state, passed by. Nor is it of consequence whether the interest be considered a part of the debt, or a consequence proceeding from it; and it is equally unimportant whether interest be allowed by way of damages, or for the *use* or *forbearance* of money. Nor is it material to the case under consideration, that there are instances in which interest is not allowed; the question is, is the present a case in which it ought, or ought not to be charged?

I shall consider the question, *first* on principle; and *second,* by the authorities. One of the ancient reasons for excluding interest has long since been exploded, to wit, that it should never be permitted, because money could not produce money. The reverse of this is most true, for nothing can more readily produce money, than money itself; for if a person is fortunate enough not only to have money sufficient for his ordinary demands, that is for the comfortable accommodation of himself and family, but also a surplus, unless that surplus is permitted to lay idle, locked up in his chest, or be injudiciously employed, he will soon find it the most profitable fund he could possess. If you refuse interest on the ground that money cannot produce money, you might as well refuse to the owner a compensation for any other property of which he is deprived, or which is withheld from his possession. Land itself unemployed, or injudiciously used, will never produce money; the labour, industry, and attention of man, must be exercised before its produce can be turned into cash—without labour it must forever remain

unproductive; and yet, if the land be wrongfully detained, whether it be productive or not in the possession of the wrong-doer, he is bound to account to the true owner for what it might have produced had it been advantageously or judiciously managed. The same reasoning applies to every other species of property, the possession whereof the true owner is deprived; and as long as money, by being employed, can command an interest sanctioned by the laws of the country in which it is, so long is he, who *withholds* it from the proprietor, bound to pay an interest, whether the money be used or permitted to be idle. It is sufficient that the creditor, or true owner, has been deprived of receiving, and of course from using it.

But in the case now before the court, the parties, by their solemn agreement, have expressly stipulated that interest should be paid on the whole amount of the purchase money, except on the sum of $2,666⅔, from the date of the original contract—the bond and its defeasance endorsed thereon *renew* the stipulation. The parties, men of intelligence and information, fully apprised of the nature of the interest in the land, which was sold by the one and purchased by the other, fix on its value. It never entered into their minds that the sum of $10,000, agreed to be given, and to be received, was the value of the land if the remainder had taken effect in possession; in other words, if the life-estate had terminated. No doubt, if the purchase money was not to bear interest, a sum equal to the interest, when the payments became due, would have been added to the price agreed on. But, no objection against interest being paid, arises from the contracts themselves; that it ought not to be paid, is insisted on by the complainants, inasmuch as the defendant, on account of the outstanding legacies, was never able to comply with his part of the contract.

This leads to an inquiry into the true construction of that contract. It is contended, on the part of *Dorsey*, that it was incumbent on *Smith*, before he could equitably claim the purchase money, to take up the legacies, or obtain a release from the legatees to free the land from its responsibility. *Smith* in his answer, expressly states, that those legacies had for sometime been an obstacle to a contract between them, and that he agreed to take so small a sum as $10,000 for his interest, on the

ground that he might have the use of the money some considerable time before he could be called on to pay them; that he was always willing to indemnify *Dorsey*, and would have done so, but that he insisted, after the contracts were made, and before he would pay, on the previous removal or raising of the legacies, which was contrary to the previous understanding of the parties.

By the original agreement, not one word is mentioned respecting the legacies. The $10,000 were to be paid in three equal payments, and although $2,666 66, a part thereof, were not to bear interest, yet, in order to make the payments equal, the contract appears to require that one third part of that sum should have been included in each payment, and not to be retained for the last. A different interpretation would make the payments unequal, contrary to the express stipulation of the instrument. As the legacies were known to be a charge on the land, *Dorsey* would have been bound to pay them when they became due, or rather, the land in his hands, or of those claiming under him, must have been responsible—the $10,000 would have been the price for the remainder *cum onere.* If it had been the intention of the parties that the legacies should be removed before the payment of the whole or any part of the purchase money, it might easily have been so expressed; but so far from stating with precision how far the payments were to be influenced by them, not one word is said on the subject. It may have happened from their having before been an obstacle to an agreement being closed.

There is very little probability that any expectation was entertained that the legacies would become due before the purchase money for the remainder; but the contract expressly points out the respective periods of payments. Except for what is termed by the parties the "rider," no doubt could exist on the subject. The first subject of difference between the parties was not the legacies, but the $2,666 66, whether that sum should be equally paid, as the instalments became due, or reserved to the last.

To remove the necessary inference that the remainder in the land was purchased subject to the legacies, the endorsement signed by the parties is attached to the written agreement—"I

is understood that the legacies charged by the will of *Henry A. Smith* to be paid out of his real estate, are not to be satisfied by *C. Dorsey*, but that the land is to be exonerated by *Charles S. Smith from the payment thereof.*" It does not appear to me that this endorsement to the original agreement demanded that the legacies should be taken up before the purchase money for the remainder was paid.    It was not in the power of *Smith* to *compel* the legatees to release them, *or* to part with them, nor until they were discharged was it in his power to clear the land from being charged with the payment, and of course it was not in his power to *exonerate* the land he had sold "from the payment thereof." But it may have been in his power effectually to free *Dorsey* from any *real danger* of being forced to pay them. If *Smith* had insisted on the payment of the *whole* purchase money, without first giving an adequate indemnity, the sufficiency whereof this tribunal might have been resorted to to determine, he would have been restrained from enforcing the payment. If *Dorsey* had paid the second instalment, and refused to pay the third, insisting on his right to retain at least as much of that payment as would be sufficient to meet the legacies, he would have been protected by this court; and unless full and complete indemnity was offered, *Dorsey* would have been suffered to retain the $2,666 66, paying the interest, or to bring that sum into court to be invested—the interest for the use of *Smith*—the principal to be paid to the legatees when due.    This course would have done complete justice to the parties, and carried fully into execution their engagements.    The legacies, therefore, in my opinion do not deprive *Smith* of his title to the interest.

In respect to the allegations in the bill of *Smith's* refusing to receive bank notes, doubting their solvency, and creating an impression in the mind of *Dorsey* of *Smith's* intention to wait until the money could be raised by crops—again expressing a willingness to receive bank paper, which was procured at great inconvenience and loss, it might suffice to observe, that most of those allegations are denied in the answer; and that there is no proof that *Dorsey* ever procured or tendered the notes    But if he had obtained the notes, and retained them by him ready at all times to pay on the removal of the legacies, or if he had ob-

tained specie in sufficient abundance, and retained it unemploy-
ed, yet unless he gave notice to *Smith* of having the money,
and that it was ready for him, and as to *Dorsey* remained un-
employed, it would not free him from interest.

In the case of *Powell vs. Martyr*, 8 *Ves.* 146, the defendant
purchased at auction—deposited part of the purchase money—
the balance to be paid at a future date; where the purchaser was
to receive the rents and profits. Objections arose as to the ti-
tle, when a long correspondence took place, and after considera-
ble delay the objections were removed. During the time of
doubt respecting the title, the money was deposited with the
vendee's solicitor for the purpose of being paid when the ob-
jections were removed; and yet he had to pay interest; for ac-
cording to the book, "it does not follow that the mere circum-
stance that the vendor was not ready to complete the title at
the day will vary the rule. The purchaser must state some-
thing more than mere delay, viz. *that he has not had the bene-
fit of his money; and in some way the vendor must have no-
tice* that the vendee has placed himself in that situation." In
*Childs vs. Lord Abingdon*, 1 *Ves. jr.* 94, the interest purchas-
ed was a reversion upon an estate *for lives*. One life only
was remaining when the application was made to complete the
purchase. *Erskine*, Chancellor—"He must pay interest. A
man cannot purchase a dry reversion, and then lie by for years
and expect to pay no more for it then, than if he had complet-
ed it immediately." No case, it is believed, can be produced
where the parties, perfectly apprised of the nature of the inte-
rest sold, (whether it was such as became or might become im-
mediately productive to the vendee, or was what is termed a
dry reversion, and therefore supposed unproductive,) stipulated
to pay interest, has the interest been refused. In the present
case no rational doubt can arise, but that the nature of the es-
tate sold was perfectly understood; and the contract, in respect
to interest, speaks for itself. My opinion is, therefore, that the
vendee is to be charged with interest on all the purchase mo-
ney, except on $3,666 66, from the date of the original con-
tract, to wit, the 12th of March 1814; on one third of that sum
from the 25th of December following; on one other third from

the 25th of December 1815, and on the remaining third from the 25th of December 1816.

In respect to the *second* question. Is credit to be allowed for the legacy purchased, and for what amount?

It is not very evident how much was paid for the legacy purchased by *Dorsey* from *James Wheatly*, who is admitted to be entitled to one of the legacies charged on the land.

By the rider, or endorsement on the original agreement, the "legacies are not to be satisfied by *Dorsey.*" If, therefore, he has undertaken to satisfy them, or purchase them, as between him and *Smith,* he is only entitled to their worth at the time of purchase, and not to their worth when they take effect in possession.

According to calculations by which the extent of a widow's dower in land when converted into money, and by which legacies directed to be paid after a life-estate, are regulated, the legacy purchased by *Dorsey* was only worth $560 22; indeed, by the *English* rule, only $349 06. But as that rule is founded on compound interest, on the principle that the interest should (as there it may,) be immediately invested, although we adopt the time at which it is most probable the right to receive the legacy will arrive, yet its value is not come at by compound, but simple interest; and by that rule *Dorsey* can only claim, in addition to the two payments, the sum of $560 22, according to the auditor's statement in account No. 6. And the sum due, according to the statement of the auditor by an additional account made in pursuance of this decree, amounts, on the 17th of February 1817, (the time when the auditor's first statements were made,) to the sum of $5,867 25, including interest to the day.

In directing the principles by which the sum justly and *bona fide* due is come at, no regard is had to the manner of discharging the first instalment; for as the judgments, including interest and costs, excluding the two payments, the benefit of which is obtained by the authority of the court to the extent of those payments, and for the value of the legacy, relief is obtained here; but those who ask equity must do equity, and therefore the only relief which can be obtained against the amount of the

judgments, is to get free from their effects by the payment of the sum justly due.

The *last* point is the costs. Considering the difficulties arising in the cause, and the want of an early offer on the part of *Smith* to give complete indemnity as far as practicable, and the persevering demands on the part of *Dorsey* for the entire removal of the legacies, which the contracts did not warrant, and his refusal even to pay the second instalment, it is not thought correct to charge either party with the whole costs, more especially as *Dorsey* will obtain credit for the $300 and $900, which do not appear credited on the judgments, although it seems evident no intention existed to deny them; but not having been credited, executions might have issued for the full amount of the judgments. —DECREED, that unless the complainants shall, on or before the 13th of May next, pay to the defendant the aforesaid sum of $5867 25, with interest on the sum of $5831 39, a part thereof, from the 17th of February 1817, until paid, or bring the same into this court to be paid to the defendant, that the injunctions heretofore issued in this cause be and the same, from and after the said 13th of May, are hereby dissolved: Provided nevertheless, that no more be levied under executions on the said judgments than the said sum of $5867 25, with interest on the sum of $5831 39, a part thereof, from the 17th of February 1817.—*Decreed* also, that each party in this court bear his own costs. From this decree the complainants appealed to this court; and pending the appeal *Chapman's* death was suggested.

The cause was argued before BUCHANAN, Ch. J. and EARLE, MARTIN, and ARCHER, J.

*C. Dorsey*, the Appellant, in *proper person*, contended, 1. That by the decree of the chancellor *Smith* was not bound, from the proof in the cause, to exonerate the land from the liability imposed on him to pay the legacies, before he was entitled to call on *Dorsey* for the payment of the full amount of the purchase money.

2. That the said decree alleges, that the complainant, by his bill, sought relief for a credit of $900 on the judgments, which was not credited thereon, when in fact no such credit was asked

for, the same being credited on the judgments, and so stated in the defendant's answer.

3. That the said decree alleges, that the complainant asked relief, by being credited with interest from the time when the defendant declined receiving the bank notes, when in fact no such relief is aked for by the bill.

4. That the said decree alleges, that since filing of the said bill, *Smith* has procured the release of one of the legacies, when in truth there is no proof of such fact. [The release here referred to is as follows: "*Washington, Kentucky*, 7th April 1821. I do hereby acknowledge to have received of *Charles S. Smith* the sum of five hundred pounds, (*Maryland currency,*) in full for a legacy devised to me by my late brother *Henry Arundel Smith* of *Charles county, Maryland;* and I do hereby release and discharge the said *Charles S. Smith*, and the estate upon which the said legacy is charged, from all future liability therefor. Witness my hand and seal.

*Margaret Smith*, (Seal.)

Witness present,

*John Chambers.*"

Under a commission issued to the District of *Columbia* to take testimony in this cause, the handwriting of *John Chambers* of the town of *Washington*, in the state of *Kentucky*, the above subscribing witness, was proved. There was also proof by another witness that he knows the handwriting of *Margaret Smith* above mentioned, the sister of *Charles S. Smith*, from frequently corresponding with her, in the course of which correspondence he had received letters with her name signed to them, which from a subsequent course of correspondence he ascertained certainly to be her handwriting; and he had been long and intimately acquainted with her, and that he believed the signature, *Margaret Smith*, to the above paper, to be her handwriting; and he did not believe he could be mistaken about the signature.]

5. That by the said decree a credit is allowed to the complainant for the sum of $560 22, for his interest in the legacy purchased by him of *Wheatly*, when a larger sum ought to have been allowed.

6. That by the said decree no interest is allowed to the com-

plaiaant, from the time when the complainant requested *Smith* to convey his title to the land, and offered to pay him therefor, and to pay him for the legacies, when he procured a release, and when he refused to do so.

7. That the said decree allows interest on one third of the sum $2,666⅔ from the 25th of December 1 14, one other third from the 25th of December 1815, and one other third from 25th of December 1816, when no interest ought to have been allowed.

8. That the said decree decrees the sum due to the complainant on 17th of February 1817, to be the sum of $5,867 25.

9. That the said decree does not decree that upon the payment of the purchase money, *Smith* shall convey the land bought, to *Dorsey*.

10. That the said decree decrees that the injunction may be dissolved, and that execution may issue on the judgments, without decreeing that the defendant shall indemnify the complainant against the liability of the land for the legacy of Mrs *Smith*.

11. That the said decree allows interest on the amount of the legacies, when none ought to have been allowed.

12. That the said decree decrees that each party shall pay his own costs, by him incurred.

On the *first* point he insisted, that no parol evidence can be admitted to vary a written contract. *Pow. on Cont.* 430. *Rob. on Frauds* 10, 13. *King vs. Baldwin,* 2 *Johns. Chan. Rep.* 557. *Jones vs. Sluby,* 5 *Harr. & Johns.* 380.

The defendant's answer is not evidence in his own favour. *Peake's Evid.* 56. *Paynes vs. Coles,* 1 *Munf.* 373, 379. *Lady Ormond vs. Hutchinson,* 13 *Ves.* 51, 53. *Jones vs. Sluby,* 5 *Harr. & Johns.* 380. *Hart vs. Ten Eyck,* 2 *Johns. Chan. Rep.* 62.

On the *fourth* point. The release of the legacy was witnessed by *Chambers,* and he was not produced to prove it; but secondary evidence only was offered, viz. proof of the handwriting of the witness and the releasor, without sufficiently accounting for the nonproduction of the attesting witness. *Prince vs. Blackburn,* 2 *East,* 250. *Barnes vs. Trompowsky,* 7 *T. R.* 261.

On the *fifth* point. If the appellant had sued the appellee for the amount paid for *Wheatly's* legacy, he would have recovered the amount so paid. He must be considered as the agent of the appellee, doing that with his money which he was bound to do himself. The rule adopted by the chancellor, in allowing the appellant for the legacy purchased by him, was not the correct one. Doctor *Halley's* rule is not the chancery rule of this state.

On the *sixth* point. If the money was withheld, then interest is to be paid. When had the appellee a right to call for his money? It may be answered—When he gave an equivalent for it. What was that equivalent? A deed for the land, and a release from the legatees. Until he did so, he had no right to demand either the money or interest. The deed and release, and payment of the money, were concurrent acts to be performed at the same time. When the appellee brought his suit on the bond, he had no right to demand payment. He had no right to demand interest except for three years if he had complied in time. After he refused to comply, he had no right to require interest. Refusing to comply with a contract is a fraud; and a new contract sprung up after that refusal. *Hoare vs. Allen*, 2 *Dall. Rep.* 102, *(note.)* Interest upon a specialty may, under certain circumstances, be taken away in equity. *Haynes vs. Harrison*, 1 *Cas. in Chan.* 106. A vendor has no right to call for his money until he has tendered a conveyance to the vendee for the land sold. 1 *Madd. Chan.* 350. *Grantland vs. Wight*, 2 *Munf.* 186. *Blount vs. Blount*, 3 *Atk.* 636. *Wainwright vs. Read, et al.* 1 *Desauss.* 586.

If the purchaser is let into possession, &c. he pays interest; and *Powell vs. Martyr*, 8 *Ves.* 146, has been referred to by the chancellor to establish that principle. But suppose he is not let into possession under the purchase, then of course he does not pay interest. The case referred to is not applicable to the present. Here the purchaser was in possession under a superior title; and the contract for the purchase of the remainder was not a purchase of possession, but of title.

But here the appellee had no right to receive payment until he removed the incumbrance, which he had contracted to do. *Sugden*, 312. In *Child vs. Lord Abingdon*, 1 *Ves. jr.* 94,

also referred to by the chancellor, there was a solemn contract to pay interest by a third person, not by the tenant for life, who was the purchaser. In *Ex parte Manning*, 2 *P. Wms.* 410, the wearing out of the life was equivalent to profits. So also in *Davy vs. Barber*, 2 *Atk.* 489. But in *Blount vs. Blount*, 3 *Atk.* 636, the doctrine in the two last cases is exploded. *Growsock vs. Smith*, 3 *Anstr.* 877. cited in *Sugden*, 323. *Maynard's* case, 2 *Freeman* 2, cited in *Sugden*, 312.

On the *seventh* and *eighth* points. The chancellor has opened the whole contract—the defeasance, the first payment, and the judgment at law, without being asked to do so by the appellee's answer, and without any error being alleged either in the defeasance or the judgment. He has done that which was not required by either party.

On the *ninth* point. The decree does not direct that on payment of the purchase money, the appellee shall convey the land to the appellant. *Grantland vs. Wight*, 2 *Munf.* 179.

*R. Johnson*, for the Appellee. On the *fourth* point, he insisted that the proof of the release of the legacy was sufficient. If the subscribing witness is out of the jurisdiction of the court, his handwriting may be proved. That that is the rule in *England*, and is the rule here. 1 *Starkie's Evid.* 338. *Fox vs. Reil*, 3 *Johns. Rep.* 477. *Sluby vs. Champlin*, 4 *Johns. Rep.* 461.

On the *ninth* point. The decree is, that the money should be brought into court, and when so brought in, the chancellor would not direct the payment over until a deed for the land was executed to the appellant. But the record shows that a deed for the land had been executed, and it was exhibited with the defendant's answer as an *escrow*.

On the *second* point. The credit of $900 was not allowed on the judgments at law, as affirmed in the court of appeals, of course it was proper to be noticed in the decree, otherwise the appellee might have issued an execution for the whole sum. There was no injury, but rather a benefit to the appellant in allowing the credit. It is true the credit was entered on the judgments in the county court, but the records transmitted under the

appeals to the court of appeals, do not state the credit; and it was on the affirmed judgments, executions were to issue.

On the *twelfth* point. If the decree in other respects is right, then it is correct as to the costs. *West vs. Biscoe*, 6 *Harr. & Johns.* 460. *Glenn vs. Fisher*, 6 *Johns. Chan. Rep.* 33.

On the *fifth* point. There is no proof as to what sum of money the appellant paid for *Wheatly's* legacy.

On the *sixth* point. There is nothing in the contract which binds the appellee to clear the incumbrance on the land at the end of three years. As the appellant neglected to pay the last instalment in December 1816, interest was then to be charged on the whole sum due. The appellant, being tenant of the fee under his purchase, he could cultivate the land with more advantage than he could do as tenant for the life of Mrs. *Dorsey.* *Powell vs. Martyr*, 8 *Ves.* 146. *Fludyer vs. Cocker*, 12 *Ves.* 25. When the land was sold to the appellant it was worth $10,000; and if so it is now worth at least $20,000—the life-estate being supposed to be nearly expended. To compensate the appellee interest should be paid on the purchase money. *Ex parte Manning*, 2 *P. Wms.* 410. *Sugd.* 326, 320; and *Hughes vs. Kearney*, 1 *Sch. & Lef.* 132, 134.

*Magruder* and *Taney*, in reply.

ARCHER, J. delivered the opinion of the Court. There appear to be two principal questions presented in this cause, for the consideration of the court.

*First.* Ought the appellant, *Dorsey*, to be charged with interest, from what time, and on what portion of the purchase money?

*Second.* For what sum ought *Dorsey* to be credited on account of the legacy purchased by him?

The determination of the first question will depend upon the construction which shall be given to the contract between the parties. When the appellant purchased the remainder upon the death of his wife, *Smith* stipulated that he would *exonerate* the lands so purchased from the payment of the legacies charged upon it. We cannot concur with the chancellor in the belief, that by this *Smith* only agreed to indemnify

*Dorsey* against the payment of the legacies, but we consider it an undertaking to free the lands sold from all liability to pay them. The lands were charged with these legacies, and it was the object of the parties that the title to *Dorsey* should pass unincumbered by them. There is no impossibility in this covenant, as events have proven; it was one, to be sure, which might be somewhat difficult in its execution, but the legal obligation of the party must not on this account be changed. It is his agreement which has been voluntarily entered into, and the other party had a right to its performance before he could in equity be called on to pay the whole purchase money. The first instalment due by *Dorsey* on the original contract for the sale of the lands was paid, and before the second instalment became due *Dorsey* entered into a bond, conditioned for the payment to *Smith* of the residue of the purchase money, as follows: $3,333⅓, with interest from the 13th of March 1814, on or before the 25th of December 1815, and the sum of $3,333⅓, with interest on $666⅔, from the day of sale, on the 25th of December 1816. Thus by this contract there seems to have been a partial modification of the original agreement as to the payments, and being the last stipulation must be considered as binding on the parties.

By a fair construction of these agreements, although *Dorsey* had agreed to pay the whole of the purchase money by the 25th of December 1816, and *Smith* had stipulated generally that the land should be exonerated from the payment of the legacies, without having named any definite time, we consider that he was bound to have complied with his contract on the day at which the last instalment became payable. But *Smith* had, unquestionably, the whole time until that period to comply with his part of the agreement, and could not, until then, be considered in default. *Dorsey's* second instalment, with interest thereon, became due a year before, according to this construction of the agreement, *Smith* could be called on to comply on his part. He never could have looked to the exoneration of the land as a condition upon which that instalment was to be paid. He should have paid it when it became due, and his liability to pay interest thereon is not in the least changed by any of the subsequent events. He had expressly agreed to pay

interest on that sum from the date of the purchase; and the same remark may be made with regard to a part of the third instalment, to wit, the sum of $666⅔. On this he had expressly stipulated to pay interest. Could he, on any principles of equity, claim to be relieved from this express agreement? Has he tendered the money; has be been ready ever since to pay it? There is no evidence of this kind. To have placed himself in a situation to be relieved against the payment of interest on this sum, he should not only have professed a willingness to have paid, but he should have tendered the amount, which he has not done. We therefore think, that the appellant should pay interest on the second instalment, and on $666⅔, of the third instalment. But as regards the residue of the third instalment, to wit, the sum of $2,666⅔, it is to be observed, that there is not only no express promise to pay interest, but there is, by the terms of the contract, an entire exemption from payment of interest. That sum was to be paid on the 26th of December 1816, without interest; but *Smith* having put a different construction on the agreement, positively refused to *exonerate* the lands from the payment of the legacies. *Dorsey* was then justified in withholding from him payment of this sum; and according to the spirit of the original agreement, ought not, after such default, and until compliance, be compelled to pay interest on that sum. There is no principle of law which would, in such a case, entitle the vendor to the payment of interest. Had *Dorsey* been in possession of the lands, in virtue of the purchase, or in the perception of the rents and profits, in equity he would have been compellable to pay interest, because such advantages would have been considered as equivalent to interest. But he had not possession by the contract. The tenant for life was in possession, and enjoying, in virtue of such life-estate, the rents and profits. He was the purchaser of a *dry remainder*. But it is contended that the wearing out of the life-estate is equivalent to taking the profits. And this it is true, is the general position laid down in *Sugden*, 323; and the cases of *Ex parte Manning*, 2 P. *Williams*, 410, and *Child vs. Lord Abingdon*, 1 *Ves. Jr.* 94, are cited, in support of the position. The case of *Ex parte Manning* came in review before Lord *Hardwicke*, in the case of *Blount*.

vs *Blount*, 3 *Atk.* 635, who remarked that he never knew "the court take into consideration, as a reason for the purchaser paying interest, the wearing out of lives." This doctrine of Lord *Hardwicke* is sanctioned in the case of *Growsock vs. Smith*, 3 *Anstruther*, 877. The falling in of lives may be considered as equivalent to the rents and profits. *Davy vs. Barber*, 2 *Atk.* 489. *Blount vs. Blount*, 3 *Atk.* 636. And in the case *Ex parte Manning* a life had fallen in between the date of the purchase, and the application to complete the purchase; and besides, in that case the purchaser, from the date of the confirmation of the report of sale, was considered as entitled to the estate, and no obstacles were presented, or could be presented, to a completion of the title; but here the incumbrances stipulated to be released were still hanging over the purchased estate, with refusal on the part of the vendor to release them. In the case of *Child vs. Lord Abingdon*, there was a decree for the payment of interest. The Lord Chancellor said, a man could *not lie by for years*, who was the purchaser of a dry reversion, and expect to pay no more for it than if he had completed it immediately. The decision in this case is put upon the ground of delay in the purchaser who was waiting until the remaining life dropped in. Besides, in this case, like the case of *Ex parte Manning*, the purchaser's title might be considered as only requiring payment on his part to complete it. The principles which mark the distinction between the case under consideration, and those above cited, are too obvious to require further comment, or more minute illustration. When *Smith* complied with his contract in exonerating the land by the purchase of the last outstanding legacy, he was entitled to receive the part of the last instalment, amounting to the sum of $2,666$\frac{2}{3}$, and as it was not then paid, he was entitled to interest thereon from that period. This legacy was purchased by the appellee on the 7th of April 1821, from which day he should have interest on that sum.

We consider the release executed by *Margaret Smith* valid for the purpose for which it was intended, and that the proof of its execution is sufficient. Where an instrumentary witness resides out of the jurisdiction of the court, so as not to be amenable to its process, or cannot be found after strict and diligent in-

quiry, the proof of the handwriting of such witness is evidence of every thing on the face of the instrument. The scaling and delivery will be presumed. *Vide* 1 *Phil. Evid.* 419, (362,) and the cases there cited.

The consideration of the sum which should be allowed *Dorsey* for the legacy purchased by him, involves a question which has not been adjudicated by this tribunal. Should he be allowed what he proves he has paid for it? We think not. By the contract he was not to pay the legacies; it was *Smith's* business to disencumber the land. And, if he is made to suffer by the purchase, he has no person to blame but himself. When *Smith* refused to exonerate the land in violation of his contract, he subjected himself to the legal consequences of such an act; but it would be a most inequitable consequence of such refusal to say that *Dorsey* was thereby constituted his agent, with unrestricted powers to make the purchase; such a result would have placed him at *Dorsey's* mercy. But equity demands, that having purchased the legacy he should be entitled to a credit, as against *Smith*, for the legacy, at its fair value, from the date of the purchase, (17 Feb. 1817.)

By what rule is its value to be estimated? The chancellor, in his decree, has adopted that value which was ascertained by the auditor by a reference to Doctor *Halley's* table of observations, which have been used in *England* for the purpose of ascertaining the value of life annuities, and reversionary interests. These tables are framed upon long and accurate observations on the bills of mortality in *England*, and in other places, and may not be an unsafe guide for the purpose in the region or latitude for which they were calculated. But the probability of the duration of human life, cannot be the same in every latitude and climate In the one it may be prolonged to the greatest age—in the other abbreviated to what, in a more healthful region, would be considered as but a middle age; and even, indeed, in the same district of country the chance for the duration of life is by no means the same. Thus, would tables suited for the low lands of *Louisiana*, furnish any index of the duration of human life in the highlands of *Maryland?* And even in our own state, could any dependence be placed in the calculation of the value of an annuity, or of a reversion expect-

ant upon a life, which would say that as great a probability ex-isted for the duration of human life amid the marshes of the *Chesapeake Bay*, as in the mountains of *Alleghany?* These observations will be found to be verified by an examination of Dr. *Halley's* tables, as suited to different parts of *England*, and to places on the continent. Whether these tables, upon which the chancellor's decree is founded, are suitable to this state, could only be told by a long series of observations here, which not having been made, we conceive it would be unsafe to adopt them. In ascertaining the value of this legacy at the time of its purchase, we apprehend, there would be a much better chance of justice being effected by applying by analogy the rule adopted long since in the court of chancery for the purpose of ascertaining the allowance to a woman, in lieu of dow-er, in land sold under a decree of that court. Mrs. *Dorsey* is shown to have been about forty years of age at the date of the purchase, and the calculation should be made in conformity with the above rule. By such calculation the legacy was worth the sum of $761 90. With this value the appellant should be credited on the day of the purchase of the legacy. He should also have credit for the sum of $300, paid on the 26th of February 1816, and the further sum of $900 on the 29th of December 1816.

We concur with the chancellor in his judgment as to the costs incurred in that court.

It is our opinion the appellant should be decreed to pay into the court of chancery the sum due *Smith*, on some day to be fixed by this court, and on failure to pay by such day, that the injunction ought to be dissolved. And it is further our opinion, that the appellee, in case the appellant should pay into court the sum ascertained to be due by the day to be appointed, be only permitted to receive the same, upon his satisfying the chancellor that he has executed, acknowledged and delivered, to the appellant, *Dorsey*, a good and sufficient deed of conveyance, passing all his right to the lands sold the appellant in conformity with their contract dated the 13th of March 1814. DECREED, that the decree of the court of chancery, except as to the costs incurred in that court, be reversed, and that the appellant recover against the appellee, the costs by the appellant expended in the

prosecution of his appeal to and in this court. And this court, proceeding to pronounce such decree as the court of chancery ought to have pronounced—*Decreed* also, that there shall be credited on the judgments mentioned in the proceedings the sum of $300, paid on the 26th of February 1816; the sum of $900, on the 29th of December 1816; and of the further sum of $761 90, paid on the 17th of February 1817, to *James Wheatly,* for his mother's legacy. That the sum of $2,666⅓, being part of the last instalment, shall bear interest from the 7th of April 1821; and that the claim of the appellee arising on the said judgments be stated as follows:

*Clement Dorsey* in account with *Charles S. Smith.*

| | | |
|---|---:|---:|
| For principal of second insalment, | $3,333 | 33 |
| Part of third instalment, | 666 | 67 |
| | 4,000 | 00 |
| Interest thereon from the 13th of March 1814 to the 29th of December 1816, | 670 | 67 |
| Costs on judgments at law, | 35 | 86 |
| | 4,706 | 53 |
| 1816. February 26. Then paid 300 | | |
| December 29. Then paid 900 | 1,200 | 00 |
| | 3,506 | 53 |
| Interest on balance to the 17th of February 1817, | 28 | 05 |
| | 3,534 | 58 |
| Then paid James Wheatly, | 761 | 90 |
| | 2,772 | 68 |
| Interest on balance to the 13th of July 1826, | 1,564 | 72 |
| Amount of legacies, | 2,666 | 67 |
| Interest on $2,666 67 from the 7th of April 1821 to the 13th of July 1826, | 842 | 67 |
| | $7,846 | 74 |

*Decreed* also, that unless the appellant shall, on or before the 1st of January next, bring into the court of chancery, to be paid

to the appellee, the said sum of $7,846 74, with interest on $5,439 35 part thereof, from this 13th of July 1826 until brought in, the injunctions heretofore issued in this cause be and the same, from and after the said 1st of January next, shall be dissolved; Provided nevertheless, that no more be levied under executions on the said judgments at law, than the sum of $5,439 35, with interest on $2,772 68, part thereof, from the 17th of February 1817, and with interest on $2,666 67, the residue thereof, from the 7th of April 1821, until paid, together with any additional costs that may accrue on any proceedings that may be had on the said judgments. *Decreed* also, that in case the appellant shall, by the 1st of January next, bring into the court of chancery the said sum of $7,846 74, with interest on $5,439 35, part thereof, from this 13th of July 1826 until brought in, the appellee shall be only permitted to receive the same upon his satisfying the chancellor that he has granted and conveyed to the appellant, and his heirs, in fee simple, by a good and sufficient deed of conveyance, duly executed, acknowledged and recorded, according to law, passing all his right, title, estate and interest, to and in the lands sold to the appellant, in conformity with their contract bearing date the 13th of March 1814. And in case the appellant shall fail to bring into the court of chancery by the 1st of January next, the said sum of money, with interest as aforesaid, the injunctions on the judgments aforesaid shall not be dissolved, unless the appellee shall satisfy the chancellor that he has, by a good and sufficient deed of conveyance, duly executed, acknowledged and recorded, according to law, granted and conveyed the said lands to the appellant, and his heirs, in fee simple, in the manner before stated. And *decreed* also, that the chancellor pass all necessary orders and decrees for carrying this decree into full and complete effect.

DECREE REVERSED, &c.