MARY F. ABERCROMBIE AND OTHERS,
vs.                                        } DECEMBER TERM, 1850.
ROBERT RIDDLE AND OTHERS.

[RULE FOR ASCERTAINING THE PRESENT VALUE OF A LIFE INTEREST.]

THE ancient rule of the Court, fixing the allowance to a woman in lieu of dower, applies in all cases where it becomes necessary to ascertain the present value of a life interest.

This rule having been sanctioned by the Court of Appeals, in the case of *Dorsey* vs. *Smith*, 7 *H. & J.*, 345, the authority of this Court to change it is questionable; and even if it could do so with propriety, the change should be prospective, and not so as to affect an actually depending case.

The Courts have no dispensing power over their rules and long established practice, and the party to whose prejudice an innovation upon the rule of Court is made, has a right to seek redress in the Appellate Court.

This rule has reference to the case of a healthy person, and where the *cestui que vie* is of infirm health, an abatement of the allowance must be made therefor; this is as imperatively required by the rule, as the ratio of distribution prescribed by it.

The *cestui que vie* was fifty-three years of age at the time of sale, and it was proved that her health was infirm, that her constitution never had been robust, and that her lungs were diseased. HELD—that five years was a sufficiently large addition to her age, on account of ill health.

Where stocks are sold before the dividends are declared, the latter pass by the sale, and transfer to the purchaser.

The stocks in this case were sold shortly before the day for declaring dividends had arrived. This sale was made by consent of all parties, including the assignee of the life interest in them. HELD—that the assignee was not entitled to any allowance out of the proceeds of sale, on account of dividends which had accrued up to the day of sale.

The hypothesis, that the value of the stock was enhanced in precise proportion to the amount of the dividends which had accrued up to the day of sale, rests upon a foundation of too much uncertainty, to justify the Court in making it the basis of its judgment.

---

[In this case, by the consent of all parties interested, a decree was passed for the sale of 650 shares of bank stock, standing in the name of trustees, in trust for the use of Mary F. Abercrombie for life, with remainder to her children. Mrs. Abercrombie had assigned her interest in said stock to the Baltimore Life Insurance Company, which consented to the sale. The sales amounted to $29,438 13, and the cause being referred to the Auditor, he stated four accounts distributing the proceeds, marked A, B, C, D, and E. In account A, he assigned to the Insurance Company, as the assignee of Mrs. Abercrombie's life interest in the stock, one-third of the net proceeds of sale. This allowance was made according to the rule of Court, and the age of the tenant for life, and amounted to $9,362 74. Account B differs only in adding five years to the age of the tenant for life, on account of her infirm health, in making the allowance to her assignee, which by this account amounted to $8,426 46.

Accounts C and D were stated under instructions from the Solicitor of the Insurance Company. In the former (account C), the proportions of the dividends of the stock which had accrued to the day of sale, were assigned to said Company, amounting to $1,006 61, and the allowance for the said life estate was calculated according to the principal sum, of which the income of the stock sold is the interest at six per cent., and amounted by this calculation to $12,292 27. Account D differs from account C, in that the allowance for the life estate was made according to the *Carlisle tables*, taking the income

of the net sales, after deducting the dividends as the basis, and giving 9,761 years purchase thereof as the value of the life estate according to said tables, estimating the present value of the annuity at six per cent. By this estimate, the allowance amounted to $21,135 49. In account E, six per cent. on the net proceeds of sale, according to accounts A and B, was assumed as the proper basis for the annuity, and the value of the life estate was calculated in the same way as in account D. By this estimate, the allowance amounted to $16,450 12.

The Auditor submitted that all these accounts were erroneous except account B. It was proved that Mrs. Abercrombie, at the time of the sale, was fifty-three years of age; that her health was very precarious and infirm; that from her infancy her constitution was never robust, and that her lungs were diseased, and she had had several hemorrhages. A deposition of John F. James, the Actuary of the Girard Life Insurance Company of Philadelphia, to the effect that the Carlisle tables were used by all, or very nearly all such companies in this country, and that they furnish a good business criterion, when used as the basis of transactions was also filed in the cause.

The Insurance Company excepted to the report and accounts of the Auditor : 1st. Because accounts A, B, and C, in making allowance for the life interest, do not base it upon the actual probabilities of life at the age of the *cestui que vie,* as ascertained by the best authorities. 2d. Because a deduction is made in account B, on account of the ill health of the *cestui que vie.* 3d. That no allowance is made in the first three accounts to the Company, for the proportionate part of the dividends which had accrued up to the day of sale.

The complainants also excepted, because in account B a sufficient deduction was not made from the value of the life interest of Mrs. Abercrombie, on account of the bad state and condition of her health, they insisting that the Auditor ought to have added *ten* years or more, instead of *five,* to her age. They also excepted to the computation of such allowance by the Carlisle tables.

These exceptions having been set down for hearing, and having been argued by the solicitors of the respective parties, the Chancellor delivered the following opinion thereon.]

THE CHANCELLOR :

The first and most important of the questions raised in this case, by the exceptions of the Baltimore Life Insurance Company, to the report of the Auditor, and upon which I have had the advantage of hearing a very good argument on both sides, was raised and discussed in the case of *Peyton* vs. *Ayers*, recently decided by this Court, and reported in 2 *Md. Chancery Decisions*, 64.

In that case, which was brought before me on two occasions, I expressed the opinion founded upon the case of *Dorsey* vs. *Smith*, 7 *H. & J.*, 345, that the ancient rule of the Court, adopted for the purpose of fixing the allowance to a woman in lieu of dower, was proper to be followed in all cases, when it became necessary to ascertain the present value of a life interest, and when the case was last under consideration, the rule was not applied, because the particular point to be decided did not necessarily present the question. But in disposing of the case of *Peyton* vs. *Ayers*, upon a ground which relieved me from the obligation to apply a rule, with which I think there is some reason to be dissatisfied, I most distinctly recognised its controlling power over this Court so long, at least, as the rule remains unrescinded.

I then said : "But although the Court of Appeals might, and I think would at this day, establish a different rule for ascertaining the value of life annuities, I certainly do not feel myself at liberty to do so. So long as the case of *Dorsey* vs. *Smith* stands unreversed and unqualified by the high tribunal which decided it, it would be, it appears to me, unbecoming in this Court, and inconsistent with that subordination to superior authority so necessary to the orderly and harmonious administration of justice, to adopt a different principle." 2 *Md. Ch. Decisions*, 70, 71.

The rule of this Court, which the Court of Appeals adopted

by analogy in *Dorsey* vs. *Smith*, was established as far back as 1804, and though perhaps occasionally complained of, has never, so far as I know, been deviated from to the present day. It is therefore entitled to great respect, and though as a mere rule of this Court it might, perhaps, be altered, upon the evidence which subsequent experience and observation have furnished, upon the principle that the authority which made it is competent to alter it, yet I apprehend after it has received the sanction of the Superior Court, the authority so to deal with it by this Court becomes much more questionable, or at all events, it should be careful to act only upon the fullest evidence.

But even if this Court could with propriety change the rule, it appears to me the change should be prospective, because it may reasonably be supposed that in transactions like the present, the parties have shaped their conduct with some reference to the existing rule. I do not mean to be understood as saying, that the Insurance Company, in buying or selling annuities, is governed by the rule, because it appears they have adopted tables for their guide, which do not conform with the rule, subject of course to be varied according to circumstances; but it is by no means an extravagant supposition, that when this Company, or any other holder of a life estate, or annuity for life, consents to a sale of such interest by *the decree of this Court*, that regard is had to the Chancery rule, and that some of the parties, at least, to the cause would be taken by surprise, if that rule should be set aside and another substituted for it.

In the present case, it is said the sale of the property was sought by the parties entitled in remainder, and by Mrs. Abercrombie, for their own accommodation; and the bill does allege that a sale will be for their benefit, and that the Insurance Company is willing that the property (consisting of bank stock) should be sold, the Company receiving of the proceeds the value of the life interest of Mrs. Abercrombie, of which they were the purchasers.

Now it may very well be, that these plaintiffs considered it

would be for their advantage to sell the property, dividing the proceeds according to the rule of the Court, when they would have taken a very different view of the matter, if the proceeds were to be distributed according to another rule, of which, in view of the established law of this Court, they could not possibly have had the slightest conception. And the result of the various accounts stated by the Auditor in this case, showing how seriously and injuriously their rights will be affected, if the rule is departed from, may well create a doubt whether, if they could have anticipated any such course, they would have asked for a sale.

It has been observed, that though this Court may possess the power to change prospectively the rule regulating the proportions in which the proceeds of property sold under its authority shall be distributed between the dowress and heir-at-law, or between the holder of the life estate and those entitled in remainder, its authority to make such alteration with regard to an actually depending case, when it may well be supposed the parties have had the rule in contemplation, is liable to very grave doubts. The case of *Wall* vs. *Wall*, 2 *H. & G.*, 79, is well calculated to confirm these doubts, it having been there decided that the Courts have no dispensing power over their rules and long-established practice, and that a party to whose prejudice an innovation upon the rule of the Court is made, has a right to seek redress in the Appellate Court.

I am, therefore, of opinion, that the first exception of the Insurance Company cannot be maintained, and that the rule of the Court applies to and must govern this cause.

And as it is thought the distribution must be made in conformity with the rule, and the rule has no reference to the case of a healthy person, it follows that some abatement must be made on account of the delicate health of Mrs. Mary F. Abercrombie, the *cestui que vie*. This, it appears to me, is as imperatively required by the rule as the ratio of distribution prescribed by it; and hence I think the second exception of the Insurance Company is not well taken.

The Auditor, in his account B, has added five years to the

age of Mrs. Abercrombie because of her infirm health, and this is excepted to by the complainants as insufficient, her precarious condition, as they insist, requiring a much larger addition to her age.    According to a table, incorporated in the very elaborate and learned opinion of the late Chancellor, in *Williams's Case, 3 Bland,* 238, the expectation of life of a person fifty-three years of age, which was the age of Mrs. Abercrombie at the period of the sale, is within a fraction of fifteen years, and the addition of five years to her age on account of ill health, reduces the expectation to a little over thirteen years.    The chancery rule is supposed to have been constructed upon this table, and the question is, whether the Auditor has made a sufficiently large addition ?

In the very nature of things it is absolutely impossible to establish a fixed standard upon a subject like this.    Every case must depend upon its own peculiar circumstances, and with all the lights which science can shed upon it, we can only hope to approximate to that which the future alone will reveal.    Evidence has been taken in this case, which certainly does show that the *cestui que vie* is in infirm health, but we have not the benefit of the opinions of her physician with regard to the probable duration of her life.    Even with the aid of such an opinion, we might wander far from the true mark, but without it our conjectures are much more likely to lead us astray. Certain it is, as appears by some of the depositions, that the disease of Mrs. Abercrombie, though alarming, and though, judging from her frail condition, her death is an event which cannot long be deferred, is not likely, if we may judge from the past, to bring her existence to a very speedy conclusion. Her constitution seems to have resisted it for many years, and there is nothing in the evidence from which it can be inferred that it is now so broken down as to be incapable of yet further resistance.    The hope can scarcely be indulged that she will live beyond or perhaps attain the age usually allotted to human existence, but the presence of the disorder which forbids this hope, may probably furnish some security that her life will not be brought to a very speedy termination, as it

seems to be well established that the human system, when laboring under a chronic affection, is measurably exempt from those acute and rapid attacks before which the vital principle rapidly gives way. Judging, therefore, from all before me, and being painfully conscious that I am to a great extent groping in the dark, I am persuaded that by approving the conclusion to which the Auditor has come upon this question, I am quite as, and perhaps more, likely to do justice to the parties than by adopting any other course. Considering the long series of years through which Mrs. Abercrombie's constitution has maintained her against the approaches of the disease which is gradually but slowly wearing away her life, I see no reason to suppose it may not yet be protracted for the period assumed by the Auditor, and therefore shall overrule the exception of the complainant in this respect.

The remaining question arises upon the third exception of the Insurance Company to the accounts reported by the Auditor, marked A, B, and E, because they do not give to the Company, as assignee of Mrs. Abercrombie, a proportionate part of the dividends on the stock sold, which had accrued up to the day of sale.

The stocks, it appears, were sold some short time before the declaration of the dividends, and it is of course conceded that the title to the dividends subsequently declared passed by the sale and transfer of the shares to the purchaser. There cannot, therefore, be any claim to a proportion of the dividends *as such*, nor has any such claim been asserted in the argument. The exception is pressed, not upon the ground that the Company is entitled to any part of the dividend received by the owner of the stock when it was declared, but upon the hypothesis that as the value of the stock must have been enhanced by the near approach of the period when a dividend might be expected, it is reasonable to presume its price in the market was improved in proportion to such enhancement in the value. That is, it is supposed the purchaser gave not only the value of the stock, irrespective of the dividend, but in addition thereto, the proportion of dividends which had accrued to the

day of sale. It appears to me, however, that this hypothesis rests upon a foundation of too much uncertainty to justify the Court in making it the basis of its judgment. The price of stocks, and especially of bank stock, is affected by too many causes to enable any one to say that its depression or elevation is attributable to any particular cause. Even the stock of the General Government, and of the States, and the obligations of the great incorporated companies, bearing a fixed rate of interest, do not invariably appreciate in price as dividend day approaches, or at least the appreciation is not in exact proportion to the interest which from day to day is accruing upon it. The condition of the money market frequently exerts an influence upon the price of such securities, powerful to countervail the effects of an approaching dividend, and therefore even with reference to these securities, it would frequently be unsafe to assume that the price paid for them at any given period was augmented in exact proportion to the interest which had accrued upon them to such period.

But if this be so with regard to stocks bearing a *fixed* rate of interest, when the amount accrued can be calculated with absolute certainty, how much more cautious should the Court be in saying, that stocks which have no determinate rate of interest have appreciated in precise proportion to the dividend which had accrued upon them at the period of the sale, when a dividend is subsequently declared? In this case the Insurance Company, the owner of the stocks for the life of Mrs. Abercrombie, might have refused to consent to the sale until after the usual dividend day, and then, of course, they would have received it. But this delay would have exposed the Company to some danger, and it may be that this consideration had some influence in inducing them to accede promptly to the application for a sale.

The solicitor of the Company has urged, in arguing this exception, that portion of the bill which says it will be for the benefit of Mrs. Abercrombie and her children that the stock should be sold, "and the proceeds divided among the parties in an equitable manner." This, it is said, may fairly be construed

as applying to the dividends, and to mean that the party entitled to them shall, out of the proceeds of the sale of the stock, receive that portion of the dividends which had then accrued. I am persuaded, however, that this view of the subject was not within the contemplation of the complainants when the bill was filed. When they spoke of an equitable partition of the proceeds of the sale, they meant that the Insurance Company should receive a fair equivalent for the life estate of Mrs. Abercrombie, but I am very confident they had no reference whatever to dividends of the stock then or thereafter to accrue. They could not have anticipated *when* the sale would be made, and as the Company had the power to control that event, their rights should not be prejudiced by the fact that it actually took place within a short period of the dividend.

No case has been cited which, in its material features, is analogous to this. In the case of *Wiegal* vs. *Brome*, 9 *Eng. Cond. Ch. Rep.*, 188, the fund out of which the annuities were payable was actually received by the trustee, and it was decided, that as the period fixed by the testator for the termination of the annuities occurred after the last half-yearly day of payment, that the annuitant was entitled to a proportional part, from such day to the time when the annuity was to cease altogether. But here, no time was definitely fixed when the dividends which might be declared upon these stocks should cease to be payable to the Insurance Company. And in the very nature of things, the amount of the dividends was always more or less conjectural, until actually declared. In *Wiegal* vs. *Brome*, the time for which the annuity was to be paid was fixed, and the rents upon which it was charged, were received by the trustee. But in this case, the title of the Company to receive the dividends was liable to be defeated at any time, by the demise of Mrs. Abercrombie, the amount uncertain, and, by the act of the Company itself, the right to this contingent profit upon the stock was transferred to third persons. The Company does not, and can not claim the dividends, or a proportion of them, upon the ground that they have been, *eo no-*

*mine*, received by the trustee. Their claim in this regard rests and has been urged upon the assumption, that the stock sold for so much more as that proportion of the dividends which had then accrued bore to the whole amount thereof, when subsequently declared; an assumption which, I think, cannot safely be made, in view of the numerous causes, more or less fictitious and speculative, which influence the price of such securities.

The case of *Ex parte Rutledge*, *Harp. Eq. Rep.*, 65, resembles the present case in this, that it was a question as to the apportionment of the dividends on bank stock between the donee for life, who died a few days before a semi-annual dividend was declared, and the party entitled in remainder. The Court there decided that the dividend should be apportioned, and the amount which had accrued at the donee's death should be paid to his executor. But in that case the dividend, *as such*, was actually received by the party who was to make the apportionment. There was no sale of the stock, before the dividend was declared, by consent of the parties, and the Court was not consequently required to act upon the assumption that the purchaser gave precisely so much more for it as the dividend then accrued amounted to. That circumstance, as I conceive, separates that case from this by a broad and clearly defined line. The Court there was acting upon a reality. The dividend was in hand, and it was thought, and I think justly thought, that the interposition of Providence, in terminating the existence of the donee for life, a few days before its declaration, should not deprive his representative of that proportion which had accrued in his lifetime.

I have read with attention the deposition of Mr. John F. James, and assuming that it would be proper, in a case circumstanced like the present, to change the existing rule, I should doubt very much the authority of this Court to do so upon the facts therein stated. It seems to me that the ancient, steadily adhered to, and highly sanctioned rule of this Court, should not be varied, unless demonstrated to be erroneous by more conclusive evidence than is furnished by this deposition. This remark is made without intending the slightest disrespect to Mr.

James, who, I have no doubt, is a gentleman of the highest respectability, but because the facts deposed to by him are not, in my opinion, of that character which would warrant the Court in disregarding its own rule, and establishing another materially affecting the rights of property.

My opinion, therefore, is, that the account B, reported by the Auditor, is correct, and I shall pass an order ratifying it.

GRAFTON L. DULANY, for the Complainants.
THOS. DONALDSON, for the Insurance Company.